A.L. ADAMS CONSTRUCTION
CO., Plaintiff,

v.

GEORGIA POWER COMPANY,
Defendant.

Civ. A. No. CV 181–31.

United States District Court,
S.D. Georgia,
Augusta Division.

Jan. 3, 1983.

tor. In Count 1 of the complaint, plaintiff contends that defendant's refusal to hire plaintiff was the result of a combination and conspiracy between defendant and others to exclude nonunion contractors from working at the Burke County construction site. Count 1 alleges that such a combination and conspiracy violated § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1; plaintiff, therefore, seeks to recover treble damages under § 4 of the Clayton Act, 15 U.S.C. § 15, for injuries to its business and property caused by defendant's antitrust violation. In Count 2, plaintiff contends that the refusal to hire it constituted a breach of contract by defendant.

This case is presently before the Court on plaintiff's motion for summary judgment filed October 12, 1982, and defendant's motion for summary judgment filed October 13, 1982.[1] For the reasons stated below, plaintiff's motion is DENIED, and defendant's motion is GRANTED as to Count 1 (the antitrust claim) but DENIED as to Count 2 (the contract claim).

ANTITRUST CLAIM

A. *Agreement with Trades Council*

1. *Facts*

The following facts pertinent to plaintiff's antitrust claim are either undisputed, are disputed without reasonable justification in the record, or may be assumed in plaintiff's favor for purposes of defendant's motion for summary judgment with regard to the antitrust claim:

(a) A.L. Adams Construction Company ("Adams") is a nonunion contractor operating in the building and construction industry.

(b) Georgia Power Company ("Georgia Power") is an investor-owned electric utility

Ira Genberg, Atlanta, Ga., Wiley S. Obenshain, III, Augusta, Ga., for plaintiff.

Michael C. Murphy, Atlanta, Ga., Wyck A. Knox, Jr., Augusta, Ga., for defendant.

ORDER

ALAIMO, Chief Judge.

On February 16, 1981, A.L. Adams Construction Company filed a civil complaint in this Court against Georgia Power Company. The plaintiff alleged that it was refused a job as building contractor at defendant's construction site in Burke County, Georgia, because plaintiff was a nonunion contrac-

---

1. Plaintiff argues that, under the terms of an Order entered by this Court on May 10, 1982, all motions to dismiss or for summary judgment were required to be filed by October 12, 1982, and that, since defendant's summary judgment motion was not filed until October 13, 1982, the motion was untimely and should be denied. *See* Plaintiff's Brief in Response to Defendant Georgia Power Company's Motion for Summary Judgment, 1–4 (November 10, 1982). Since plaintiff claims no prejudice to it resulting from the alleged late filing (plaintiff, in fact, admits being served with a copy of defendant's summary judgment motion on October 12) and since the Court finds considerable merit in defendant's motion, the Court believes that the purposes of justice are better served by considering the merits of defendant's motion than by rigidly enforcing a rather complicated series of filing requirements.

company whose common stock is wholly-owned by The Southern Company, a registered public utility holding company.

(c) Georgia Power currently has under construction in Burke County, Georgia, a nuclear-powered generating facility which is known as Plant Vogtle. Georgia Power owns a 50.7% undivided ownership interest in Plant Vogtle.

(d) In early 1982, the total cost of completing Plant Vogtle was estimated to be five and one-half billion dollars ($5,500,000,-000.00).

(e) Georgia Power hired no general contractor to supervise the overall progress of the Plant Vogtle project, preferring instead to act as its own "construction manager" while subcontracting all the major phases of the job to other contractors.

(f) Over a period of several months prior to beginning construction on Plant Vogtle, Georgia Power negotiated an agreement known as the Plant Vogtle Project Agreement with the construction trade unions from the Augusta area, who were represented by the Augusta Building and Trades Council. The agreement set many of the terms and conditions of employment for craft workers employed at Plant Vogtle.

(g) The Project Agreement was binding on Georgia Power, and its terms were intended to apply also to any subcontractors hired by Georgia Power.

(h) From the time of the making of the Agreement to the present, the only business activity conducted by Georgia Power at the Plant Vogtle site has been the construction of the Plant.

(i) Subsequent to the negotiation of the Project Agreement, Georgia Power employed on its own payroll approximately 150 craft workers referred to it under the provisions of the Project Agreement to perform construction work at Plant Vogtle. These workers were hired from eight or nine of the thirteen unions signatory to the Project Agreement. At present, Georgia Power has hired no craft workers from four of the signatory unions.

(j) In March of 1980, Georgia Power invited six contractors, including Adams, to submit bids on the contract for construction of the Administration Building at Plant Vogtle. Three of the invited contractors submitted bids, and Adams' bid was the second lowest. Georgia Power, however, rejected this round of bids because only one of the companies submitting bids was a union contractor and the low bidder was a nonunion contractor.

(k) On the second round of bidding for the Administration Building, six contractors, including Adams, submitted bids. The bid submitted by Adams was the lowest in total dollar amount. After some discussion between Georgia Power and Adams about how Adams could satisfy Georgia Power's requirement of all-union contractors, Georgia Power decided to reject Adams' bid and awarded the contract to the next lowest bidder, Mobley Construction Company, which was a union contractor.

(*l*) Because Adams was a nonunion contractor, Georgia Power refused to grant Adams the contract to construct the Administration Building.

### 2. The Alleged Restraint of Trade

Adams contends that the Project Agreement negotiated by Georgia Power with the Trades Council of Augusta was intended to, and had the effect of, limiting the subcontracting of work at Plant Vogtle to union subcontractors and that such a limitation constitutes a conspiracy or combination to restrain trade, in violation of § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. Adams further contends that, but for this alleged agreement, Adams would have been permitted to perform the construction work on the Administration Building at Plant Vogtle.

Georgia Power denies that the Project Agreement prevents the owner from hiring nonunion subcontractors and contends that it decided unilaterally to use only union subcontractors in order to insure labor harmony at Plant Vogtle. Georgia Power alternatively argues that, even assuming that it entered into an agreement with the

Trades Council to exclude nonunion contractors from Plant Vogtle, such an agreement is protected from antitrust penalties by the nonstatutory labor exemption that has developed in the federal courts. Georgia Power also contends that the alleged agreement to exclude nonunion contractors is expressly authorized by the construction-industry proviso to § 8(e) of the National Labor Relations Act, 29 U.S.C. § 158(e), and therefore cannot be a violation of the antitrust laws. Since both of the exemptions claimed by Georgia Power were analyzed by the Supreme Court in *Connell Construction Company v. Plumbers and Steamfitters Local No. 100*, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975), that case provides the cornerstone for analysis of the present case.

### 3. *Supreme Court Background*

In *Connell,* Local 100 was the bargaining representative for workers in the plumbing and mechanical trades in Dallas. Connell Construction Company of Dallas was a general construction contractor that subcontracted all plumbing and mechanical work to other firms. *Id.* at 619, 95 S.Ct. at 1833, 44 L.Ed.2d at 424. Since Connell never directly hired any plumbers or mechanical workers, Local 100 never represented—and expressly disclaimed any interest in representing—Connell employees. *Id.* Local 100 *did* seek an agreement from Connell that the contractor would subcontract its me-

chanical work only to firms that had a collective-bargaining agreement with Local 100. *Id.* When Connell refused to enter into this agreement, Local 100 picketed one of Connell's major jobsites, causing a work stoppage and forcing Connell to sign the agreement under protest. *Id.* at 620, 95 S.Ct. at 1834, 44 L.Ed.2d at 425.

Connell argued in federal court that the agreement violated the Sherman Act provisions against monopolies and restraints of trade and was, therefore, invalid. *Id.* The Supreme Court considered two defenses raised by the union: (1) organized labor's nonstatutory exemption from federal antitrust law; and, (2) the primacy of the construction-industry proviso to § 8(e) of the NLRA over antitrust policy.

With regard to the nonstatutory labor exemption, the Court acknowledged that, in such cases as *Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), and *Meat Cutters v. Jewel Tea Co.*, 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965),[2] it had recognized "that a proper accommodation between the congressional policy favoring collective bargaining under The NLRA and the congressional policy favoring free competition in business markets requires that some union-employer agreements be accorded a limited nonstatutory exemption from antitrust sanctions." 421 U.S. at 622, 95 S.Ct. at 1835, 44 L.Ed.2d at 425–426.[3] The Court determined, however,

---

**2.** For a more detailed analysis of the development of the nonstatutory labor exemption than is necessary here, see *Mid-America Regional Bargaining Association v. Will County Carpenters District Council,* 675 F.2d 881, 890–892 (7th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 132, 74 L.Ed.2d 114 (1982). *See also* St. Antoine, *Connell: Antitrust Law at the Expense of Labor Law,* 62 Va.L.Rev. 603, 604–616 (1976).

**3.** For the difference between the statutory and nonstatutory labor exemptions, see *Connell, supra,* 421 U.S. at 621–622, 95 S.Ct. at 1834–35, 44 L.Ed.2d at 425–426; *Mid-America Regional Bargaining Assoc. v. Will County Carpenters District Council,* 675 F.2d 881, 884–886, 890–893 (7th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 132, 74 L.Ed.2d 114 (1982). In *Consolidated Express, Inc. v. New York Shipping Association,* 602 F.2d 494 (3d Cir.1979), *vacated on other grounds,* 448 U.S. 901, 100 S.Ct. 3040,

65 L.Ed.2d 1131 (1980), the Third Circuit gave the following explanation of the nonstatutory exemption: "The term nonstatutory exemption, commonly used in discussing the interface between the often conflicting national antitrust and labor policies, is a shorthand description of an interpretation of the Sherman Act, making that statute inapplicable to restraints imposed in the interest of lawful union monopoly power in the labor market." *Id.* at 513. The Third Circuit also explained that "the rationale of the exemption is protection of the union's power to eliminate competition in the labor market over wages and working conditions. Restraints operating on that primary market are presumptively outside the scope of the Sherman Act.... [B]ut restraints ... which are aimed at controlling a secondary product or service market are suspect, and are presumptively covered by the Sherman Act." *Id.* at 514. One commentator argues persuasively that subcon-

that since Local 100 had no interest in representing Connell's employees, the "federal policy favoring collective bargaining ... can offer no shelter for the union's coercive action against Connell or its campaign to exclude nonunion firms from the subcontracting market." *Id.* 421 U.S. at 626, 95 S.Ct. at 1837, 44 L.Ed.2d at 428. The Court clearly indicated that, in other contexts, a restraint on subcontracting "might be entitled to an antitrust exemption *if it were included in a lawful collective-bargaining agreement.*" *Id.* (emphasis added).

■ Thus, in the present case, if it can be shown as a matter of law that the alleged agreement restricting subcontracting was the product of a collective-bargaining process, the policy favoring collective bargaining might well shelter the agreement from antitrust scrutiny.[4]

With respect to the argument of Local 100 that the kind of agreement it obtained from Connell was explicitly condoned by the construction-industry proviso to § 8(e) and that antitrust policy must, therefore, defer to the NLRA, the Court, in rejecting the union's position, once again focused on the lack of a collective-bargaining relationship between Connell and Local 100.

The relevant portions of § 8(e) provide: It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforceable and void: *Provided,* That nothing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work....

29 U.S.C.A. § 158(e).

In *Connell,* the Supreme Court acknowledged that a literal interpretation of the construction-industry proviso would not limit the provision to agreements resulting from the collective-bargaining process. The Court nevertheless determined that "Congress intended only to allow subcontracting agreements *within the context of a collective-bargaining relationship;* that is, Congress did not intend to permit a union to approach a 'stranger' contractor and obtain a binding agreement not to deal with nonunion subcontractors." 421 U.S. at 627–628, 95 S.Ct. at 1837, 44 L.Ed.2d at 429

---

tracting restraints are properly classified as primary labor-market restraints, as long as such restraints are not used to fix prices or allocate product markets *a la Allen Bradley Co. v. Local No. 3, IBEW,* 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945). Leslie, *Principles of Labor Antitrust,* 66 Va.L.Rev. 1183 (1980).

**4.** Although the nonstatutory labor exemption has been most commonly asserted by the labor unions themselves, in this case it is the employer who seeks the protection of the exemptions. When an agreement with a union forms the basis of an antitrust claim against an employer, the employer may assert the labor exemption if the exemption would have been available to the union. The reasoning of the Seventh Circuit on this point is quite persuasive:

Although both the statutory and the nonstatutory exemptions are generally phrased as exemptions for union behavior, logic dictates that they be applied to all parties when an agreement with a union forms the basis of a complaint. The exemptions would serve little purpose in furthering national labor policy if employers risked liability under the antitrust laws for entering into collective bargaining agreements. Other circuits have concurred in this judgment. "To preserve the integrity of the negotiating process, employers who bargain in good faith must be entitled to claim the antitrust exemption." *Scooper Dooper, Inc. v. Kraftco Corp.,* 494 F.2d 840, 847 n. 14 (3d Cir.1974). *See also Amalgamated Meat Cutters & Butchers Local 576 v. Wetterau Foods, Inc.,* 597 F.2d 133, 136 (8th Cir.1979); *Mackey v. NFL,* 543 F.2d 606, 612 (8th Cir.1976), *cert. dismissed,* 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977). *Mid-America Regional Bargaining Association v. Will County Carpenters District Council,* 675 F.2d 881, 890 n. 22 (7th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 132, 74 L.Ed.2d 114 (1982).

(emphasis added). The Court reached this conclusion by examining the purposes of the proviso as reflected in the comments and reports of the legislators who formulated and passed the provision.[5] The Court recognized especially that the proviso reflected the "close community of interests" of workers on a construction site and the inherent possibilities for friction when union subcontractors work alongside nonunion subcontractors at a particular jobsite.

The Court noted that the agreement between Local 100 and Connell had no relationship to these policy considerations, since the agreement was with a "stranger" contractor and was not limited to any particular jobsites. *Id.* at 631, 95 S.Ct. at 1839, 44 L.Ed.2d at 431. The Court stated:

Local 100 does not suggest that its subcontracting agreement is related to any of these policies. It does not claim to be protecting Connell's employees from having to work alongside nonunion men. The agreement apparently was not designed to protect Local 100's members in that regard, since it was not limited to jobsites on which they were working. Moreover, the subcontracting restriction applied only to the work Local 100's members would perform themselves and allowed free subcontracting of all other work, thus leaving open a possibility that they would be employed alongside nonunion subcontractors. Nor was Local 100 trying to organize a nonunion subcontractor on the building project it picketed. The union admits that it sought the agreement solely as a way of pressuring mechanical subcontractors in the Dallas area to recognize it as the representative of their employees.

*Id.*

The Court indicated that these deficiencies resulted in large part from the lack of a collective-bargaining relationship between the parties. The Court, therefore, held that because the agreement was "outside the context of a collective bargaining relation-ship and not restricted to a particular jobsite," it was not authorized by the construction-industry proviso and was subject to attack under the antitrust laws. *Id.* 421 U.S. at 635, 95 S.Ct. at 1841, 44 L.Ed.2d at 433.

In *Woelke & Romero Framing, Inc. v. NLRB,* —— U.S. ——, 102 S.Ct. 2071, 72 L.Ed.2d 398 (1982), the Supreme Court recently amplified the reasoning of *Connell* with regard to the construction-industry proviso. Writing for a unanimous Court in *Woelke,* Justice Marshall stated:

[In Connell] the Court concluded ... that the protection of the [construction industry] proviso "extends only to agreements in the context of collective-bargaining relationships." *Connell Construction Co. v. Plumbers & Steamfitters Local 100,* 421 U.S. 616, 633, 44 L.Ed.2d 418, 95 S.Ct. 1830. In this case, we decide a question left unresolved in Connell: the extent to which the proviso shelters agreements sought or obtained within the context of a collective bargaining relationship.

—— U.S. at —— n. 8, 102 S.Ct. at 2076–77 n. 8, 72 L.Ed.2d at 407 n. 8. The Court determined that, when a restrictive subcontracting clause is "sought or negotiated within the context of a collective bargaining relationship," the clause is protected by the construction-industry proviso, even if the clause is "not limited in application to particular jobsites at which both union and nonunion workers are employed." *Id.* at ——, 102 S.Ct. at 2083, 72 L.Ed.2d at 415. In reaching this conclusion, the Court extensively discussed the legislative history of § 8(e) and found that Congress added the construction-industry proviso to § 8(e) with the intention of maintaining the then-existing pattern of collective bargaining in the construction industry, including broad subcontracting restrictions. *Id.* at ——, 102 S.Ct. at 2081–82, 72 L.Ed.2d at 413. The Court acknowledged that such agreements create a "top-down" pressure for unionization, but the Court determined that:

---

5. *See Pacific Northwest Chapter of the Associated Builders & Contractors, Inc. v. NLRB,* 654 F.2d 1301 (9th Cir.1981), *aff'd in pertinent part sub nom. Woelke & Romero Framing, Inc. v.* NLRB, —— U.S. ——, 102 S.Ct. 2071, 72 L.Ed.2d 398 (1982), for a very detailed review of the legislative history and judicial development of the construction-industry proviso.

Congress endorsed subcontracting agreements obtained in the context of a collective-bargaining relationship—and decided to accept whatever top-down pressure such clauses might entail. Congress concluded that the community of interests on the construction jobsite justified the top-down organizational consequences that might attend the protection of legitimate collective-bargaining objectives.

*Id.* Thus, in *Woelke,* the Court concluded that the protection of the construction-industry proviso is broad when subcontracting agreements are the product of collective bargaining. In light of *Woelke,* the Ninth Circuit very recently held a subcontracting clause "sought or negotiated" in the context of a collective-bargaining relationship was protected by the construction-industry proviso and was *not,* therefore, a violation of the antitrust laws. *Brogan v. Swanson Painting Co.,* 682 F.2d 807 (9th Cir.1982).

Thus, in light of *Connell* and *Woelke,* it appears that to qualify for either the nonstatutory labor exemption or the antitrust immunity implicit in the construction-industry proviso, the Project Agreement signed by Georgia Power and the Trades Council must have been negotiated in a collective-bargaining context.[6]

**6.** Georgia Power argues that the alleged subcontracting clause should be protected by the construction-industry proviso even if no collective-bargaining relationship existed between Georgia Power and the Trades Council. This argument is based on the contention that *Connell* makes the construction-industry proviso applicable if a collective-bargaining relationship is found *or* the subcontracting agreement is restricted to a single work site. *See Connell, supra* 421 U.S. at 633, 95 S.Ct. at 1840, 44 L.Ed.2d at 432 (proviso "extends only to agreements in the context of collective bargaining relationships and . . . possibly to common-situs relationships on particular jobsites as well"); *see also Pacific Northwest Chapter of Associated Builders & Contractors, Inc. v. NLRB,* 654 F.2d 1301, 1317–1321 (9th Cir.1981), *aff'd in part and vacated in part, Woelke & Romero Framing, Inc. v. NLRB,* —— U.S. ——, 102 S.Ct. 2071, 72 L.Ed.2d 398 (1982).

Since this Court finds that the alleged subcontracting agreement was reached in the context of a collective-bargaining relationship *and* was restricted to a single site, the Court makes no determination as to the validity of Georgia Power's argument that the single-site limitation

### 4. The Collective-Bargaining Relationship

Georgia Power makes no claim that, at the time the Project Agreement was negotiated and signed, the Trades Council was the designated bargaining agent of a majority of Georgia Power's employees engaged in construction crafts at Plant Vogtle. In fact, at the time the agreement was made, Georgia Power had *no* employees engaged in the construction crafts at Plant Vogtle. Since the Trades Council had not been elected by a majority of Georgia Power's employees, the Council was not authorized to enter into a standard collective-bargaining agreement according to § 9 of the NLRA. 29 U.S.C. § 159.

Georgia Power does contend, however, that the alleged subcontracting restriction was included in a prehire agreement validated by § 8(f) of the NLRA.[7] 29 U.S.C. § 158(f). Adams, on the other hand, contends that the Project Agreement does not qualify for § 8(f) treatment because Georgia Power was not and is not an employer primarily engaged in the building and construction industry.

The Supreme Court has held that it is an unfair labor practice under § 8 of the

is alone sufficient to invoke the construction-industry proviso.

**7.** Georgia Power also contends that the prehire agreement matured or ripened into a full-fledged collective-bargaining agreement when Georgia Power hired employees through the craft unions to work at Plant Vogtle. *See NLRB v. Local 103, Ironworkers,* 434 U.S. 335, 98 S.Ct. 651, 54 L.Ed.2d 586 (1978); *NLRB v. Haberman Construction Co.,* 641 F.2d 351, 357 (5th Cir.1981) (en banc); *Giordano Construction Co.,* 256 NLRB No. 10 (May 18, 1981), *cited with approval in Woelke & Romero Framing, Inc. v. NLRB,* —— U.S. ——, ——, 102 S.Ct. 2071, 2082, 72 L.Ed.2d 398, 414 (1982). Since this Court is prepared to hold that a § 8(f) prehire agreement constitutes a collective-bargaining relationship within the meaning of *Connell,* it is unnecessary to decide whether the prehire agreement in question actually matured into a § 9(a) collective-bargaining agreement. Thus, the Court finds the fact that Georgia Power eventually hired employees from only 8 or 9 of the 13 signatory unions to be legally insignificant in the present circumstances.

NLRA for an employer and a union to enter into a collective-bargaining agreement, recognizing the union as the exclusive bargaining representative, when the union has not been authorized by a majority of the employees. *Garment Workers v. NLRB,* 366 U.S. 731, 737, 81 S.Ct. 1603, 1607, 6 L.Ed.2d 762 (1961). "Section 8(f) of the Act specifically provides, however, that it shall not be an unfair labor practice for an employer [engaged primarily in the building and construction industry] to make an agreement with a labor organization covering employees engaged in the building and construction industry prior to the establishment of majority status for the labor organization." *NLRB v. Haberman Construction Co.,* 641 F.2d 351 (5th Cir.1981).

■ Furthermore, in *Donald Schriver, Inc. v. NLRB,* 635 F.2d 859 (D.C.Cir.1980), *cert. denied,* 451 U.S. 976, 101 S.Ct. 2058, 68 L.Ed.2d 357 (1981), the Court of Appeals for the District of Columbia, in a thorough and persuasive consideration of prehire agreements, has held that a valid prehire agreement satisfies the *Connell* requirement of a collective-bargaining relationship as a prerequisite to application of the construction-industry proviso. 635 F.2d at 872–876. In *Schriver,* the court responded in the following manner to the argument that a § 8(f) relationship is not sufficient to satisfy the "collective-bargaining relationship" requirement of *Connell:*

> [T]o satisfy *Connell,* it is irrelevant that the contract is merely a "prehire agreement" authorized by § 8(f) and the union lacks established majority status.... Since § 8(f) provides the very means by which unions and employers typically initiate a bargaining relationship in the construction industry, we reject the employers' argument that an § 8(f) relationship is insufficient to satisfy the collective bargaining requirement of *Connell.*

*Id.* at 873. In support of this conclusion, the *Schriver* court looked in detail at the legislative history of § 8(f), concluding that the history of the provision "strongly supports the position that an 8(f) agreement occurs 'in the context of collective-bargain-

ing' in the construction industry." *Id.* at 874. This Court agrees.

Noting the occasional and intermittent nature of employment in the construction industry, the Senate Report concerning § 8(f) concluded that standard § 9(a) collective-bargaining relationships are often not feasible in the construction industry. S.Rep. No. 187, 86th Cong., 1st Sess. 55 (1959), U.S.Code Cong. & Admin.News 1959, pp. 2318, 2373. *See Donald Schriver, supra,* 635 F.2d at 874. Prehire agreements thus offer some security to employers and employees in an industry where stability is a rare but important commodity. As the court in *Schriver* so logically stated, "[i]t would make little sense to conclude that this necessary and most common type of collective bargaining relationship in the construction industry, specifically recognized and authorized by Congress, is not a 'collective-bargaining relationship' as that term is used in *Connell.*" 635 F.2d at 874–875.

Finally, specifically addressing restrictive subcontracting clauses contained in prehire agreements, the Court of Appeals stated:

> There is nothing in the legislative history to suggest that prehire agreements are limited to certain terms and conditions of employment, and may not include others. The same Congress that adopted § 8(f) in 1959 added to the newly enacted § 8(e) a proviso that expressly authorizes subcontracting agreements in the construction industry. There is no reason why Congress would *protect* subcontracting agreements in the construction industry under § 8(e), and at the same time *prohibit* the most common and possibly the only effective means by which such an agreement may be obtained. *We hold, therefore, that a subcontracting agreement sought in the context of an § 8(f) prehire agreement does not violate § 8(e). Id.* at 875.

(emphasis added).

■ Thus, if the Plant Vogtle Project Agreement qualifies as a valid prehire agreement under § 8(f), the collective-bargaining context that was absent in *Connell* would be present in the instant case; and,

according to *Woelke* and *Schriver,* the protection of the construction-industry proviso would be available to Georgia Power. Adams, however, argues vigorously that the Project Agreement between Georgia Power and the Trades Council does not qualify as a valid prehire agreement in the construction industry under § 8(f). Adams' strongest contention[8] is that Georgia Power is not "an employer engaged primarily in the building and construction industry" within the meaning of § 8(f) nor "an employer in the construction industry," as required by the construction-industry proviso. Common sense and a review of the applicable law reveal that Adams' argument must fail.

In *Zidell Explorations, Inc.,* 175 N.L.R.B. 887 (1969), the National Labor Relations Board addressed the issue whether a corporation whose primary activity was shipbuilding could enter into a § 8(f) agreement with respect to persons it would employ in the dismantling of a missile site that it had purchased from the Government. *Id.* at 889. The Board reversed a trial examiner, who had denied Zidell the protection of § 8(f) because its regular business was shipbuilding. The Board observed that it would be anomalous to find that a general contractor doing essentially the same work as Zidell could enter into valid prehire agreements while Zidell could not. *Id.* The Board then concluded that Zidell's work on the missile site was characteristic of that performed in the construction industry, and it could, therefore, enter into a § 8(f) prehire agreement with regard to employees who would work *at that site,* despite the fact that Zidell regularly engaged in other work unrelated to the construction industry. *Id.*

In 1978, the Board capsulized its *Zidell* ruling in the following way: "The [§ 8(f)] exemption has also been applied to employees whose general business is not in the industry, but who are engaged in construc-

tion on a specific project." *Construction, Building Materials & Miscellaneous Drivers, Local 83,* 243 N.L.R.B. 328, 331 (1978). In *Hoover, Inc.,* 240 N.L.R.B. 593 (1979), the Board adopted the opinion of the Administrative Law Judge who concluded that the employer was not primarily engaged in the construction industry with respect to a strip coal mine and rock quarries that it operated. The judge noted in a footnote, however, that at "other locations of this employer, it was clearly engaged in the construction of buildings, and that at those sites was admittedly primarily engaged in construction and at those locations could effectuate 8(f) agreements." *Id.* at 599 n. 17.

It is true that the Board has ruled that § 8(f) does not apply to an employer who has only a negligible involvement in the construction in process. *See Frick Company,* 141 N.L.R.B. 1204, 1208 (1963). There can be no genuine denial of the fact that Georgia Power's involvement in the construction process at the Plant Vogtle site was more than negligible.

■ Since Georgia Power acted as its own construction manager, foregoing employing a general contractor at Plant Vogtle, the unions naturally looked to Georgia Power as the only employer with authority to negotiate a comprehensive prehire agreement. Had Georgia Power employed a general contractor to do exactly the kind of work its own employees did at Plant Vogtle, there is no doubt that the general contractor would have been qualified to enter into a valid prehire agreement. If Georgia Power is not considered an employer within the construction industry, the unions would be put at a disadvantage simply because Georgia Power chose not to hire a general contractor. Such an unfair and illogical result can be avoided by simply recognizing the only proper legal conclusion which can

---

8. Adams also argues that the Project Agreement was not a collective-bargaining agreement nor a labor agreement of any kind because Georgia Power's chief negotiator of the Project Agreement refused to characterize it as a collective-bargaining agreement or labor

agreement. Whether parties apply legally correct labels to the agreement is irrelevant. Whether or not this Court should consider the Project Agreement to be part of a collective-bargaining context is a question of law.

be drawn from the uncontroverted facts: Georgia Power was an employer engaged in the construction industry at the Plant Vogtle site and was, therefore, qualified to negotiate a valid prehire agreement under § 8(f) of the NLRA.

The Court, therefore, concludes that the Project Agreement in question was negotiated in the context of a "collective bargaining relationship" as that term is used in *Connell* and *Woelke*. Consequently, Georgia Power is entitled to invoke an exemption from antitrust penalties under the construction-industry proviso and the nonstatutory labor exemption.

### B. *Agreement with Southern Company Services, Inc.*

On April 1, 1982, Adams amended its original complaint to include Southern Company Services, Inc. ("Southern"), as a coconspirator with Georgia Power. Adams, in relatively incidental fashion, contends that its antitrust claims should be sustained on the basis of an alleged conspiracy between Georgia Power and Southern, which are two subsidiaries of The Southern Company.

With regard to Southern's involvement in the alleged conspiracy, Adams makes the following allegations:

Although Southern was not involved in the original decision to exclude nonunion contractors from the Project (Southern was not involved in the negotiation or execution of the Project Agreement), it did become aware of the Project Agreement, learned that only union contractors could work at Plant Vogtle, and made decisions and recommendations in conformity with the requirements of the Project Agreement. It is black letter law that one who joins a conspiracy with knowledge of what has gone on before and with an intent to pursue the same objectives may be charged with the preceding acts of its co-conspirators.

Brief in Support of A.L. Adams Construction Co.'s Motion for Summary Judgment, 53 (October 12, 1982). Since the Court has concluded that the original decision to ex-

clude nonunion contractors does not violate the antitrust laws, it logically follows that, assuming Southern joined in an agreement, what it joined was not an existing illegal conspiracy but, rather, an agreement specifically validated by the Nation's labor laws and policies.

Consequently, the Court concludes that there exists no genuine issue of material fact with regard to the claim that Southern and Georgia Power had an agreement to restrain trade in violation of the Sherman Antitrust Act. The Court further concludes that Georgia Power is entitled to judgment as a matter of law as to the allegation of an illegal agreement with Southern.

### CONTRACT CLAIM

Having carefully considered the motions for summary judgment by both parties, the Court concludes that several issues of material fact are still in dispute with regard to the contract claim embodied in Count 2 of the complaint. Whether the parties had reached a binding agreement on all crucial terms—especially whether sufficient agreement had been reached on the manner in which Adams would meet Georgia Power's requirements regarding the union status of contractors—is still vigorously disputed by the parties. Such factual issues must await determination by a trier-of-fact at a trial on the merits. Consequently, both plaintiff's and defendant's motions for summary judgment are DENIED with respect to Count 2 of the complaint.

### CONCLUSION

On the basis of the foregoing discussion of the facts and law pertinent to this case, the Court concludes that the Project Agreement in question was negotiated in the context of a "collective bargaining relationship" as that term is used in *Connell* and *Woelke*. The Court, therefore, holds that Georgia Power is entitled to exemption from antitrust penalties by virtue of the construction-industry proviso and the nonstatutory labor exemption. Accordingly, defendant's motion for summary judgment is GRANTED with respect to the claims based on liability under the Sherman Act

(Count 1 of the complaint), and plaintiff's motion for summary judgment with regard to the antitrust claims is DENIED. Furthermore, both plaintiff's and defendant's motions for summary judgment are DENIED with respect to Count 2 of the complaint.