A.L. ADAMS CONSTRUCTION COMPA-
NY, Plaintiff-Appellant,

v.

GEORGIA POWER COMPANY,
Defendant-Appellee.

No. 83–8094.

United States Court of Appeals,
Eleventh Circuit.

June 4, 1984.

Ira Genberg, Atlanta, Ga., for plaintiff-appellant.

Michael C. Murphy, Robert P. Edwards, Jr., Hugh M. Davenport, Atlanta, Ga., for defendant-appellee.

Before FAY and HENDERSON, Circuit Judges, and BOYLE*, District Judge.

ALBERT J. HENDERSON, Circuit Judge:

A.L. Adams Construction Company (Adams) appeals from the grant of summary judgment to Georgia Power Company (Georgia Power) by the United States District Court for the Southern District of Georgia. *A.L. Adams Construction Co. v. Georgia Power Co.*, 557 F.Supp. 168 (S.D.

* Honorable Edward J. Boyle, Sr., U.S. District Judge for the Eastern District of Louisiana, sitting by designation.

Ga.1983). The sole issue is whether Georgia Power entered into a conspiracy to exclude Adams from participation in the construction of the Alvin W. Vogtle Nuclear Project in Burke County, Georgia, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.[1] Finding no reversible error, we affirm the judgment of the district court.[2]

At all times relevant to this appeal, Georgia Power was the principal owner of the Plant Vogtle project, located approximately forty miles from Augusta, Georgia. In 1974, the Augusta Building and Trades Council, as the representative of the local unions, and Georgia Power entered into a project agreement covering all construction work at the power plant except fence erection. The project agreement provides the terms and conditions of work at the site. Craft workers who seek employment at Plant Vogtle must be referred by the unions through union hiring halls. Initially, Georgia Power hired approximately 150 craftsmen for construction work. Since 1978, however, Georgia Power has not employed any craft workers and at no time did Georgia Power hire any members of four of the thirteen unions which are parties to the project agreement. Georgia Power did not obtain the services of a general contractor to manage the construction, but supervised and coordinated the work with its own employees.[3]

One part of the Plant Vogtle project was the erection of the administration building. In March, 1980, Georgia Power solicited bids for the building from six contractors, including Adams. All the bids were rejected when Georgia Power discovered that the low bid was made by a nonunion contractor. Georgia Power had decided to employ only union contractors on the project. A few months later, Georgia Power solicited more bids, all from union contractors. Because it employed nonunion workers, Adams was not initially invited to bid but Adams assured Georgia Power that it would comply with the project agreement if it were awarded the contract.

Adams submitted the lowest bid. Representatives of Georgia Power and Southern Company Services, Inc. (Southern)[4] met with Adams to determine whether Adams could comply with Georgia Power's requirement to use union contractors. Deciding that Adams' proposed arrangements were not satisfactory, Georgia Power rejected Adams' bid and awarded the contract to the next lowest bidder, Mobley Construction Company, a union contractor. It is undisputed that Adams was excluded because it was a nonunion contractor.

In a comprehensive opinion, the district court addressed whether the project agreement or Georgia Power's dealings with Southern constituted conspiracies in re-

1. Section 1 provides, in relevant part:
   Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce among the several states, or with foreign nations, is declared to be illegal.
   15 U.S.C. § 1. Violations of this section entitle the injured party to treble damages. 15 U.S.C. § 15.

2. In its complaint, Adams also included a state law claim for breach of contract against Georgia Power. The district court denied both parties' motions for summary judgment on this count. In a separate appeal, this court affirmed the denial of Adams' motion on the contract cause of action. *A.L. Adams Construction Co. v. Georgia Power Co.*, 557 F.Supp. 168, 177 (S.D.Ga. 1983), *aff'd*, 733 F.2d 853 (11th Cir.1984).

3. One court stated that "Georgia Power, for itself and as agent for the other owners, oversees the entire [Plant Vogtle] project." *Luke v. Ows-*

*ley and Sons, Inc.*, No. CV 181–129, opinion at 2 (S.D.Ga.1982). Georgia Power provides all the contractors' equipment, pays their insurance and sets the work schedules and rules. The contractors can hire only the number of employees authorized by Georgia Power. Georgia Power "controls the time, manner and method of the construction ...." *Id.* at 3. Because of its pervasive authority, the court held that Georgia Power, for worker's compensation purposes, was the employer of even the contractor's employees. Such involvement undermines Adams' argument that Georgia Power did not act as a contractor on the site.

4. Georgia Power and Southern are subsidiaries of the Southern Company. Southern was involved with many of the aspects of the Plant Vogtle Project.

straint of trade in violation of the Sherman Act, 15 U.S.C. § 1. Citing *Connell Construction Co. v. Plumbers and Steamfitters Local No. 100*, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975), the district court held that the project agreement, if part of a collective bargaining relationship, was immune to attack under labor's nonstatutory exemption to the antitrust laws[5] and the construction industry proviso to § 8(e) of the National Labor Relations Act (N.L.R.A.), 29 U.S.C. § 158(e).[6] *See also Woelke & Romero Framing, Inc. v. N.L.R.B.*, 456 U.S. 645, 666, 102 S.Ct. 2071, 2083, 72 L.Ed.2d 398, 415 (1982). The district court found the requisite collective bargaining nexus because the project agreement qualified as a valid prehire agreement under § 8(f) of the N.L.R.A., 29 U.S.C. § 158(f).[7] Having held that the project agreement to exclude nonunion contractors did not violate the antitrust laws, the district court determined that Southern's participation was also lawful.

## I.

The United States Supreme Court considered the reach of the construction industry proviso in *Connell, supra.* Local 100, which represented plumbing and mechanical workers, had an agreement with the Mechanical Contractors Association, a large group of contractors, which provided that the contractors would subcontract mechanical work only to those firms which had an agreement with Local 100. In addition, if the union gave better terms to other contractors, it agreed to extend the same terms to the parties to the agreement. The Connell Construction Company (Connell) refused to sign the agreement and the local picketed one of its job sites, causing delays. The union, however, admitted that it did not seek to represent any of Connell's employees. Connell signed under protest and sued the union for violations of the Sherman Act.

The union claimed the agreement was exempt from the antitrust laws because it qualified under the construction industry proviso in § 8(e). Although the statutory language is unqualified, the Court indicated that it should be interpreted in light of Congressional intent. Thus, the proviso's exemption

> extends only to agreements in the context of collective-bargaining relationships and, in light of congressional references to the Denver Building Trades problem, [*NLRB v. Denver Building & Construction Trades Council*, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284 (1951)] possibly to common-situs relationships on particular jobsites as well.

---

5. Because of our resolution of this case, we express no opinion regarding the application of the nonstatutory exemption to these facts. For a discussion of this exemption, see, P. Arreda, *Antitrust Analysis* 110–12 (1981), L. Sullivan, *Antitrust* 723–31 (1977); Hoffmann, *Labor and Antitrust Policy: Drawing a Line of Demarcation*, 50 Brooklyn L.Rev. 1, 25–36 (1983); St. Antoine, *Connell; Antitrust Laws at the Expense of Labor Law*, 62 Va.L.Rev. 603, 604–16 (1976).

6. Section 8(e) provides in relevant part:

   It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void: *Provided,*

   That nothing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work ....

   29 U.S.C. § 158(e).

7. Section 8(f) states, in part, that

   It shall not be an unfair labor practice under subsections (a) and (b) of this section for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged (or who, upon their employment, will be engaged) in the building and construction industry with a labor organization of which building and construction employees are members (not established, maintained, or assisted by any action defined in subsection (a) of this section as an unfair labor practice.)

   29 U.S.C. § 158(f).

421 U.S. at 633, 95 S.Ct. at 1840, 44 L.Ed.2d at 432 (footnote omitted). Because Local 100's agreement was not part of a collective bargaining relationship and extended beyond a particular jobsite, it was not insulated from the antitrust laws.

The Court again examined the legislative history of the construction industry proviso in *Woelke & Romero Framing, Inc. v. NLRB,* 456 U.S. 645, 102 S.Ct. 2071, 72 L.Ed.2d 398 (1982). The employers in that case maintained that the "hot cargo" clauses—preventing use of nonunion subcontractors—constituted unfair labor practices under § 8(e). The contract clauses at issue were similar to the provisions of the project agreement in this case, "they require the general contractor to boycott the services of nonunion subcontractors in order to influence the labor relations policies of the subcontractor." 456 U.S. at 653, 102 S.Ct. at 2076, 72 L.Ed.2d at 406.

The Court concluded that Congress did not intend to alter the status quo by the addition of § 8(e) to the N.L.R.A.[8] and that collective bargaining agreements limiting subcontracting to union contractors were legal prior to the enactment of § 8(e).[9] Thus,

> the construction industry proviso to § 8(e) of the [N.L.R.A.] ordinarily shelters union signatory subcontracting clauses that are sought or negotiated in the context of a collective-bargaining relationship, even when not limited in application to particular jobsites at which both union and nonunion workers are employed.

*Id.* at 666, 102 S.Ct. at 2083, 72 L.Ed.2d at 415. Any added pressure on a subcontractor to unionize was acceptable provided

that the subcontracting clause was achieved within a collective bargaining relationship. *See Brogan v. Swanson Painting Co.,* 682 F.2d 807, 810–11 (9th Cir.1982) (restrictive subcontracting clause in context of a collective bargaining agreement not a violation of the antitrust laws).

## II.

To claim the antitrust exemption under § 8(e), therefore, Georgia Power must show that the project agreement was arrived at within a collective bargaining framework. At the time of the agreement no work had begun on the project and no workers had been hired. Hence, the Augusta Building and Trades Council did not qualify as the elected bargaining representative of the employees. It therefore was unable to enter into a standard collective bargaining contract within the meaning of 29 U.S.C. § 159.

■ A collective bargaining relationship may be established through a valid prehire agreement executed in accordance with § 8(f). *Donald Schriver, Inc. v. N.L.R.B.,* 635 F.2d 859, 872–76 (D.C.Cir.1980), *cert. denied,* 451 U.S. 976, 101 S.Ct. 2058, 68 L.Ed.2d 357 (1981). Agreeing with the National Labor Relations Board (Board), *Los Angeles Building and Construction Trades Council,* 239 N.L.R.B. 264, 268 (1978), the court stated that:

> [s]ince § 8(f) provides the very means by which unions and employers typically initiate a bargaining relationship in the construction industry, we reject the employers' argument that an § 8(f) relationship is insufficient to satisfy the collective bargaining requirement of *Connell.*

---

**8.** The Court stated that
  [i]n these cases, we decide a question left unresolved in Connell; the extent to which the proviso shelters agreements sought or obtained within the context of a collective-bargaining relationship.
  456 U.S. at 653 n. 8, 102 S.Ct. at 2076–77 n. 8, 72 L.Ed.2d at 407 n. 8.

**9.** Congress amended the N.L.R.A. and added § 8(e) through the Landrum-Griffin Act, Pub.L.

No. 86–257, 73 Stat. 543–44 (1959). Senator John Kennedy stated during the debates that
  [a]greements by which a contractor in the construction industry promises not to subcontract work on a construction site to a nonunion contractor appear to be legal today. They will not be unlawful under section 8(e).
  105 Cong.Rec. 17900 (1959), 2 *Legislative History of the Labor-Management Reporting and Disclosure Act of 1959,* at 1433.

635 F.2d at 873.[10] After examining the legislative history, the court held "that a subcontracting agreement sought in the context of an § 8(f) prehire agreement does not violate § 8(e)." *Id.* at 875.

Section 8(f) only applies to employers "engaged primarily in the building and construction industry." Admittedly, the major portion of Georgia Power's business involves the production and sale of electricity. In spite of this statutory restriction, Georgia Power may still seek the protection of § 8(f). The Board has determined that an employer, although largely involved in nonconstruction industries, may take advantage of § 8(f) if it is sufficiently engaged in construction work at one site.

This question was considered by the Board in *Zidell Explorations, Inc.*, 175 N.L.R.B. 887 (1969). Zidell contracted with the federal government to dismantle a ballistic missile complex. In determining whether Zidell qualified under § 8(f), the Board noted that

> [a]lthough the Trial Examiner found Zidell's primary field of activity to be shipbuilding, thereby disqualifying it from the § 8(f) exemption, the record is clear that Zidell's entirely separate operation at the missile site was consonant with the Congressional purposes and objectives of the 8(f) exemption.

*Id.* at 889.

*Zidell* has been followed in later decisions of the Board. In *Hoover, Inc.*, 240 N.L.R.B. 593 (1979), the Board, adopting the opinion of the administrative law judge, remarked that Zidell's main business was shipbuilding but "in the facts of that case, Zidell's employees were in an entirely different operation, the dismantling of a ballistic missile complex, which was itself con-

struction work." *Id.* at 599. Moreover, although not primarily engaged in the construction industry on the site in issue, at

> other locations of this employer, it was clearly engaged in the construction of buildings, and ... at those sites was admittedly primarily engaged in construction and at those locations could effectuate 8(f) agreements.

*Id.* at 599 n. 17. Finally, § 8(f) "has also been applied to employers whose general business is not in the industry, but who are engaged in construction work on a specific project." *Construction, Building Materials & Miscellaneous Drivers, Local 83,* 243 N.L.R.B. 328, 331 (1979) (footnote omitted).

Adams attempts to distinguish these cases, pointing out that employers such as Zidell did some of the actual construction work themselves while Georgia Power currently employs no craft workers. Such an argument is unpersuasive.[11] The Board did not base its decisions on whether and to what extent the individual contractors performed the construction jobs. Adams cites two cases for the proposition that a contractor's employees must do the actual construction work to qualify under § 8(f). In *N.L.R.B. v. W.L. Rives Co.*, 328 F.2d 464 (5th Cir.1964), the court held that manufacturers of materials are not primarily engaged in the construction industry. The court in *United Association of Journeyman and Apprentices of the Plumbing and Pipefitting Industry, Local 91 v. Kimberly-Clark Corp.*, 93 L.R.R.M. 2702 (N.D.Ala.1976) noted the lack of involvement of Kimberly-Clark's employees in the actual construction work only to refute the union's contention that its members previously were assigned the construction work

---

**10.** Adams asserts that owners of construction projects cannot benefit from the provisions of § 8(f). Yet the court in *Schriver* characterized the contractor as the "owner-builder" of an apartment complex. 635 F.2d at 863. Furthermore, we see no basis to distinguish between utility projects and construction of other types of facilities.

**11.** In discussing whether a company was an employer in the construction industry under § 8(e), W. Bruce Gillis, Regional Director of the N.L.R.B., wrote "[i]t is immaterial that Deseret is not doing any actual construction nor that its primary business once the Moon Lake Project is completed will be the operation of the power plant." Letter to Neil Andrus, Esq. (April 16, 1982), *re* International Union of Operating Engineers, Local 3, Case No. 27–CE–27 at 2.

at issue.[12]  Neither case supports Adams' reasoning.

If Adams' argument should prevail, some general contractors, which are primarily involved in the construction industry, could never qualify under § 8(f).  They may sub-contract the entire project and only manage and coordinate the work, as did Georgia Power in this case.  Yet if they did not perform any actual construction work themselves on that project Adams would have us hold that they were not entitled to the § 8(f) exemption although the contractor's entire business is associated with building and construction.  In any event, for the first four years of the project agreement, Georgia Power did employ craft workers who presumably engaged in construction work.  Georgia Power and the unions should not be penalized because Georgia Power acted as its own general contractor instead of hiring an outside contractor, which, undoubtedly, would meet the requirements of § 8(f).

The project agreement, therefore, satisfies the requirements of § 8(f) for valid prehire agreements.  As such, it provides the collective bargaining relationship necessary for the exemption from the antitrust laws under the construction industry proviso in § 8(e).

### III.

Because the project agreement is lawful, we agree with the district court that the role played by Southern does not violate the antitrust laws.  Southern and Georgia Power acted in concert to carry out the terms of the project agreement.  Regardless of whether their relationship is characterized as a separate "conspiracy" from that alleged between Georgia Power and the unions, there was no illegal conspiracy to restrain trade.  The district court correctly granted summary judgment to Georgia Power on Adams' antitrust cause of action.

The judgment of the district court is AFFIRMED.

---

12. Admittedly, a contractor's involvement in the construction must be more than negligible.  Frick Company, 141 N.L.R.B. 1204, 1208 (1963).  But, as the district court stated, "[t]here can be no genuine denial ... that Georgia Power's involvement in the construction process ... [is] more than negligible."  557 F.Supp. at 176.  *See* note 3, *supra.*