844 F.2d 69
 128 L.R.R.M. (BNA) 2060, 56 USLW 2593,
108 Lab.Cas. P 10,469,
1988-1 Trade Cases 67,962
 LOCAL 210, LABORERS' INTERNATIONAL UNION OF NORTH AMERICA,
Plaintiff-Appellee,
v.
LABOR RELATIONS DIVISION ASSOCIATED GENERAL CONTRACTORS OF
AMERICA, N.Y.S. CHAPTER, INC., and F.A. Wellington
Corp., Defendants-Appellants.
 No. 501, Docket 87-7702.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 18, 1987.
Decided April 12, 1988.
 
 Brian M. Cole, Syracuse, N.Y. (Bryant, O'Dell & Basso, Syracuse, N.Y., of counsel), for defendants-appellants.
 Richard Lipsitz, Buffalo, N.Y. (Susan R. Hutchison, Lipsitz, Green, Fahringer, Roll, Schuller & James, Buffalo, N.Y., of counsel), for plaintiff-appellee.
 Before TIMBERS, MESKILL and KEARSE, Circuit Judges.
 MESKILL, Circuit Judge:
 The policies inherent in federal labor and antitrust law have long been a source of conflict. Whereas antitrust law seeks to promote open and unfettered competition, labor law encourages collective activity by workers seeking to enhance their power in the marketplace. See Allen Bradley Co. v. Local Union No. 3, Int'l Brotherhood of Electrical Workers, 325 U.S. 797, 806, 65 S.Ct. 1533, 1538, 89 L.Ed. 1939 (1945). Indeed, the two areas of law embody "policies that often appear irreconcilable." Hoffman, Labor and Antitrust Policy: Drawing a Line of Demarcation, 50 Brooklyn L.Rev. 1, 3 (1983). See also Winter, Collective Bargaining and Competition: The Application of Antitrust Standards to Union Activities, 73 Yale L.J. 14, 16-17 (1963).
 This appeal presents questions that once again bring this conflict into sharp focus. We must decide whether a clause in a collective bargaining agreement that prohibits an employer from subcontracting work either to or from other employers that are not bound by the agreement is an unlawful restraint on trade, in violation of the Sherman Act, 15 U.S.C. Sec. 1, et seq. (1982). As a necessary corollary to this inquiry, we also must decide whether the same clause is protected by the so-called construction industry proviso to section 8(e) of the National Labor Relations Act (NLRA), 29 U.S.C. Sec. 158(e) (1982). Despite the anticompetitive effect that this clause could have on commerce among affected employers, the United States District Court for the Western District of New York, Elfvin, J., held that it was protected by the construction industry proviso and thus exempt from antitrust scrutiny. For the following reasons, we affirm.
 
 BACKGROUND
 
 1
 In 1981, plaintiff-appellee Local 210 of the Laborers' International Union of North America (the union) entered into a collective bargaining agreement with defendant-appellant Associated General Contractors of America, New York State Chapter, Inc. (AGC). AGC is a multiple-employer bargaining agent representing general contractors throughout New York State. Its Labor Relations Division negotiates and executes collective bargaining agreements with unions on behalf of AGC's members. One of AGC's members at the time of the 1981 agreement was defendant-appellant F.A. Wellington Corp. (Wellington).
 
 
 2
 The collective bargaining agreement provided grievance and arbitration procedures to be followed in the event of "any controversy, dispute or misunderstanding arising as to the meaning, application or observances of any provisions of this Agreement." If a grievance or dispute could not be resolved by on-site job supervisors, it was then to be submitted to a Joint Committee composed of three representatives each from the union and the employers. If that body was unable to resolve the matter, then the agreement provided for arbitration before an impartial arbitrator chosen by the parties.
 
 
 3
 Section 3 of Article XV of the collective bargaining agreement provided that:
 
 
 4
 An employer, who is a party to and/or is bound by the terms of this Agreement, shall not accept a contract from or subcontract work covered by this Agreement to a firm, person or group where such firm, person or group is not a party to or bound by this Agreement when the subcontracted work begins. This provision does not apply to private, commercial, and residential work, and rented equipment.
 
 
 5
 AGC claims to have objected to this restrictive subcontracting clause at the time the agreement was negotiated, asserting that it represented an unlawful restraint on trade. AGC nonetheless agreed to the inclusion of the clause in the parties' collective bargaining agreement.
 
 
 6
 In late 1981, Wellington entered into a subcontracting agreement with Bhandari Constructors & Consultants, Inc. (Bhandari). Wellington agreed to act as a subcontractor and to perform certain work for Bhandari, which was acting as the general contractor at a construction project located within the geographical jurisdiction of the union. Bhandari, however, was not a signatory to or bound by the terms of AGC's collective bargaining agreement with the union. The union filed a grievance pursuant to the terms of the agreement, charging that Wellington's subcontract with Bhandari was in violation of section 3 of Article XV. The grievance was referred to the Joint Committee. The employer representatives on the committee refused to participate in the grievance process, however, arguing that the restrictive subcontracting clause was illegal under federal antitrust law and therefore unenforceable. For similar reasons, AGC refused to participate in the selection of an arbitrator when the union insisted that the grievance be submitted for binding arbitration pursuant to the collective bargaining agreement.
 
 
 7
 The union subsequently initiated this action in the district court seeking to compel arbitration pursuant to the terms of the agreement. The union relied for jurisdiction upon section 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. Sec. 185 (1982). AGC and Wellington counterclaimed, alleging that the clause at issue was an unlawful restraint on trade, in violation of sections 1 and 2 of the Sherman Act, 15 U.S.C. Secs. 1, 2. The union thereafter moved for summary judgment, arguing that the subcontracting clause was expressly protected by the construction industry proviso to section 8(e) of the NLRA and was therefore exempt from antitrust scrutiny. The employers responded that the clause was uniquely and impermissibly broad and fell outside the intended scope of the proviso. They argued that typical restrictive subcontracting clauses in the construction industry only prohibited employers from subcontracting to non-signatories. This clause also prohibited Wellington from accepting subcontracted work from other employers who were not bound by the collective bargaining agreement--a result that the employers said was never intended by Congress when it enacted section 8(e).
 
 
 8
 Judge Elfvin granted summary judgment for the union. He first addressed the "threshold issue" of whether or not AGC and Wellington could raise "illegality as a defense" to an action to compel arbitration. Relying on Kaiser Steel Corp. v. Mullins, 455 U.S. 72, 102 S.Ct. 851, 70 L.Ed.2d 833 (1982), Judge Elfvin concluded that he "must reach the merits of an illegality defense in order to determine whether the contract clause at issue has any legal effect in the first place." See J.App. at 11-12. He therefore decided that the issue of the clause's legality was not solely within the jurisdiction of an arbitrator. Next, the district court considered whether the clause was indeed protected by the construction industry proviso. Citing Woelke & Romero Framing, Inc. v. NLRB, 456 U.S. 645, 102 S.Ct. 2071, 72 L.Ed.2d 398 (1982), Judge Elfvin held that Congress enacted the proviso in 1959 to preserve the status quo regarding collective bargaining practices in the construction industry. He then noted several pieces of evidence indicating that clauses such as the one at issue here--prohibiting subcontracting both to and from non-signatories--were used in 1959. He concluded that the clause was protected by the proviso and was therefore exempt from the antitrust laws. Having concluded that the clause was valid and enforceable, Judge Elfvin granted the union's request for arbitration in accordance with the terms of the collective bargaining agreement, ordering AGC and Wellington to participate in that process.
 
 DISCUSSION
 
 9
 Section 8(e) was added to the National Labor Relations Act in 1959 by the Labor-Management Reporting and Disclosure Act, also known as the Landrum-Griffin Act. See Pub.L. No. 86-257, Sec. 704(b), 73 Stat. 519, 543-44 (1959). Section 8(e) provides in part that:
 
 
 10
 It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible [sic] and void.
 
 
 11
 29 U.S.C. Sec. 158(e). Section 8(e) was designed to outlaw so-called "hot cargo" clauses in collective bargaining agreements, by which unions would secure agreements from employers to boycott the goods or services of other employers that did not comply with union standards or recognize a union. See National Woodwork Manufacturers Ass'n v. NLRB, 386 U.S. 612, 634-37, 87 S.Ct. 1250, 1262-64, 18 L.Ed.2d 357 (1967). See also NLRB v. International Longshoremen's Ass'n, 473 U.S. 61, 74-75, 105 S.Ct. 3045, 3053, 87 L.Ed.2d 47 (1985); Carrier Air Conditioning Co. v. NLRB, 547 F.2d 1178, 1184-85 (2d Cir.1976), cert. denied, 431 U.S. 974, 97 S.Ct. 2940, 53 L.Ed.2d 1072 (1977); Donald Schriver, Inc. v. NLRB, 635 F.2d 859, 868 (D.C.Cir.1980), cert. denied, 451 U.S. 976, 101 S.Ct. 2058, 68 L.Ed.2d 357 (1981). Liability under section 8(e) turns in large part on whether an agreement is characterized as "primary" or "secondary" in nature. See National Woodwork Manufacturers, 386 U.S. at 635-39, 87 S.Ct. at 1263-65; Carrier Air Conditioning, 547 F.2d at 1184-85. An agreement has primary objectives, and thus is outside the ban of section 8(e), if it is intended to preserve work traditionally performed by a union for a particular employer. International Longshoremen's Ass'n, 473 U.S. at 75-76, 105 S.Ct. at 3053-54; National Woodwork Manufacturers, 386 U.S. at 635-39, 644-45, 87 S.Ct. at 1263-65, 1268; Carrier Air Conditioning, 547 F.2d at 1184. Cf. Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 209-12, 85 S.Ct. 398, 402-03, 13 L.Ed.2d 233 (1964) (holding that the "contracting out" of work traditionally performed by bargaining unit employees is a mandatory subject of bargaining under the NLRA). If, on the other hand, an agreement is designed to "influenc[e] the labor relations policies of [third] parties" by prohibiting dealings with those parties, it then has secondary goals and it is barred by section 8(e). Donald Schriver, 635 F.2d at 868. See also National Woodwork Manufacturers, 386 U.S. at 635-36, 87 S.Ct. at 1263-64; Carrier Air Conditioning, 547 F.2d at 1184-85.
 
 
 12
 In enacting section 8(e), however, Congress expressly provided that purely secondary activity would be tolerated in certain industries. See National Woodwork Manufacturers, 386 U.S. at 637-38, 87 S.Ct. at 1264-65; Donald Schriver, 635 F.2d at 869. To that end, Congress added the garment industry and construction industry provisos to section 8(e).[1] The construction industry proviso states that
 
 
 13
 nothing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work.
 
 
 14
 29 U.S.C. Sec. 158(e). In combination with the other provisions of section 8(e), the proviso therefore explicitly sanctions certain "agreement[s]" between unions and employers under which the employers agree "to cease or refrain from ... doing business with any other person." Id. However, such restrictive clauses in collective bargaining agreements, amounting to secondary boycotts, undoubtedly can act as a "direct restraint on the business market[,] ha[ving] substantial anticompetitive effects, both actual and potential." See Connell Construction Co. v. Plumbers & Steamfitters Local Union No. 100, 421 U.S. 616, 625, 95 S.Ct. 1830, 1836, 44 L.Ed.2d 418 (1975). Cf. Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co., 472 U.S. 284, 290, 105 S.Ct. 2613, 2617, 86 L.Ed.2d 202 (1985) (holding that many concerted refusals to deal, or "group boycotts," are sufficiently anticompetitive to constitute per se violations of section 1 of the Sherman Act). Accordingly, clauses such as the one at issue in the instant case are vulnerable to challenge under federal antitrust law unless they are protected both by the construction industry proviso and by an exemption from antitrust scrutiny. See Sun-Land Nurseries, Inc. v. Southern California District Council of Laborers, 793 F.2d 1110, 1115-16 (9th Cir.1986) (in banc), cert. denied, --- U.S. ----, 107 S.Ct. 1299, 94 L.Ed.2d 155 (1987). Cf. United Mine Workers of America v. Pennington, 381 U.S. 657, 664-66, 85 S.Ct. 1585, 1590-91, 14 L.Ed.2d 626 (1965) (agreements resulting from union-employer bargaining are not automatically exempt from Sherman Act).
 
 
 15
 In this case, AGC and Wellington argue that the restrictive subcontracting clause enjoys neither the protection of the construction industry proviso nor of an antitrust exemption and that it therefore is facially illegal. Moreover, they pose this "illegality defense" as a bar to compelled arbitration. We therefore must address three questions: (1) whether the district court was correct in reaching the merits of the employers' illegality defense or whether that question should have been within the sole province of an arbitrator; (2) whether the clause at issue is within the intended scope of the construction industry proviso; and (3) whether the clause would therefore enjoy an exemption from the application of federal antitrust laws.
 
 A. Arbitrability
 
 16
 In deciding that he must reach the merits of the employers' illegality defense, Judge Elfvin relied on the Supreme Court's decision in Kaiser Steel. In Kaiser Steel, however, the Court addressed a jurisdictional conflict between a federal court and the National Labor Relations Board (NLRB), not one between a federal court and an arbitrator. A mineworkers' union and several coal-producing companies had entered into a collective bargaining agreement that required any employer that purchased coal from nonunion producers to pay penalties into the union's health and retirement funds. See 455 U.S. at 74-76, 102 S.Ct. at 854-55. The trustees of the fund sued Kaiser Steel in a federal district court for failure to make such payments, basing jurisdiction in part on section 301 of the LMRA. Id. at 76, 102 S.Ct. at 855. Kaiser defended by claiming that the contract provision violated section 8(e) of the NLRA and sections 1 and 2 of the Sherman Act. Id.
 
 
 17
 Both lower courts held that they could not reach the merits of the illegality defense because to do so would interfere with the primary jurisdiction of the NLRB, but the Supreme Court reversed, holding that "federal court[s] ha[ve] a duty to determine whether a contract violates federal law before enforcing it." Id. at 83, 102 S.Ct. at 859. Although the Court acknowledged that section 8(e) makes the use of hot cargo clauses an unfair labor practice--an area typically within the primary jurisdiction of the NLRB--it noted that the statute also provides that such clauses are "void at their inception and at all times unenforceable by federal courts." See id. at 84, 102 S.Ct. at 859. The court held that this second component of section 8(e) "strongly implies that a court must reach the merits of an illegality defense in order to determine whether the contract clause at issue has any legal effect in the first place." See id. See also Anderson, Hot Cargo Enforcement After Kaiser Steel: A New Look at Section 8(e), 1983 Utah L.Rev. 493, 494-97. This is particularly true when " 'labor law questions ... emerge as collateral issues in suits brought under independent federal remedies, including the antitrust laws.' " Kaiser Steel, 455 U.S. at 85, 102 S.Ct. at 860 (quoting Connell Construction, 421 U.S. at 626, 95 S.Ct. at 1837).
 
 
 18
 Although Kaiser Steel generally supports Judge Elfvin's decision to reach the merits of the illegality defense in this case, there may be different considerations in a case involving a jurisdictional conflict between a federal court and an arbitrator chosen by the parties for the resolution of their disputes. The Supreme Court has consistently held that claims based on federal statutory rights are fully arbitrable and should be decided in such a forum when the parties have so chosen by contract. See, e.g., Shearson/American Express, Inc. v. McMahon, --- U.S. ----, ---- - ----, 107 S.Ct. 2332, 2338-46, 96 L.Ed.2d 185 (1987) (holding that civil RICO claims and claims of securities fraud are arbitrable); Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 628-29, 105 S.Ct. 3346, 3355-56, 87 L.Ed.2d 444 (1985) (holding that federal antitrust claims arising in the context of international business transactions are arbitrable). However, we have held, along with others, that deference to an arbitrator may not be necessary or appropriate when there is a claim that the very contract clause that is the subject of a dispute is itself facially illegal. See, e.g., Danielson v. International Organization of Masters, Mates and Pilots, 521 F.2d 747, 754-55 (2d Cir.1975). See also NLRB v. Local 1131, Int'l Union, United Automobile, Aerospace and Agricultural Implement Workers of America, 777 F.2d 1131, 1140-41 (6th Cir.1985) (noting NLRB practice of refusing to defer to arbitration when contract clause is claimed to be illegal); International Union of Operating Engineers, Local 701, 216 N.L.R.B. 233, 234 (1975) (same), enf'd, 578 F.2d 841 (9th Cir.1978). This seems to be consistent with the Supreme Court's holding in Kaiser Steel that "federal court[s] ha[ve] a duty to determine whether a contract violates federal law before enforcing it." 455 U.S. 83, 102 S.Ct. at 859.
 
 
 19
 In any event, we need not determine whether the employers' illegality defense in this case should have been left to an arbitrator. We are confident that the parties' conduct in this case constituted a waiver of any rights they may have had to put the matter before an arbitrator. Although the union argued before Judge Elfvin that an arbitrator must decide the legality of the clause at issue, the union does not now challenge the district court's action in reaching the merits of the issue. We have held in a similar context that the failure to bring such a cross-appeal constitutes a waiver of any pre-existing claims. United Optical Workers Union Local 408 v. Sterling Optical Co., 500 F.2d 220, 224 (2d Cir.1974). Moreover, " 'the litigation of substantial issues going to the merits may constitute a waiver of [the right to] arbitration.' " Rush v. Oppenheimer & Co., 779 F.2d 885, 887 (2d Cir.1985) (quoting Sweater Bee By Banff, Ltd. v. Manhattan Industries, Inc., 754 F.2d 457, 461 (2d Cir.), cert. denied, 474 U.S. 819, 106 S.Ct. 68, 88 L.Ed.2d 55 (1985)). On appeal, the union has urged us to affirm the district court's ruling in all respects, a request that certainly constitutes "the litigation of substantial issues going to the merits." The employers have similarly argued the merits on appeal, asking us to hold that the contract clause at issue is not protected by the construction industry proviso and is therefore illegal. Furthermore, the employers refused at a much earlier juncture to participate in the grievance and arbitration process. In sum, we believe that we are justified under these circumstances in reaching the merits of the employers' illegality defense. We therefore must consider whether the restrictive subcontracting clause at issue violates either section 8(e) of the NLRA or any relevant provisions of the antitrust laws.
 
 
 20
 B. Section 8(e) of the NLRA: The Construction Industry Proviso
 
 
 21
 The construction industry proviso " 'must be interpreted in light of the statutory setting [of the Landrum-Griffin Act] and the circumstances surrounding its enactment.' " Woelke, 456 U.S. at 653, 102 S.Ct. at 2077 (quoting Connell Construction, 421 U.S. at 628, 95 S.Ct. at 1837-38). See also Sun-Land Nurseries, 793 F.2d at 1113; Donald Schriver, 635 F.2d at 871. Congress' primary purpose in enacting the proviso in 1959 was to " 'preserve the status quo ' regarding agreements between unions and contractors in the construction industry." Woelke, 456 U.S. at 657, 102 S.Ct. at 2078 (quoting National Woodwork Manufacturers, 386 U.S. at 637, 87 S.Ct. at 1265). Recognizing certain unique characteristics of collective bargaining in the construction industry, Congress was trying to " 'preserve the present state of the law with respect to ... the validity of agreements relating to the contracting of work to be done at the site of the construction project.' " Woelke, 456 U.S. at 656, 102 S.Ct. at 2078 (quoting 105 Cong.Rec. 17,900 (1959) (comments of Sen. Kennedy), reprinted in 2 NLRB, Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, at 1433 (1959) (Leg.Hist.)). See also H.R.Conf.Rep. No. 1147, 86th Cong., 1st Sess. 39 (1959), reprinted in 1 Leg.Hist. at 943. Thus, the test for the permissibility of any particular practice under the construction industry proviso is whether or not the practice is consistent with "Congress' perceptions regarding the status quo in the constructionindustry [in 1959]." Woelke, 456 U.S. at 657, 102 S.Ct. at 2078. See also Sun-Land Nurseries, 793 F.2d at 1114. " '[T]he relevant inquiry is not whether Congress correctly perceived the then state of the law, but rather what its perception of the state of the law was.' " Woelke, 456 U.S. at 658, 102 S.Ct. at 2079 (quoting Brown v. General Services Administration, 425 U.S. 820, 828, 96 S.Ct. 1961, 1966, 48 L.Ed.2d 402 (1976)).
 
 
 22
 Restrictive subcontracting clauses in collective bargaining agreements that limited the ability of employers to deal with nonunion or non-signatory subcontractors were common in the construction industry at the time of the passage of the Landrum-Griffin Act. See id. at 659, 102 S.Ct. at 2079 (citing Lunden, Subcontracting Clauses in Major Contracts (Part I), 84 Monthly Lab.Rev. 579 (1961)). The purpose of such clauses was not only to avoid the unique job-site friction that could exist when union and nonunion workers were employed on the same construction site, but also to recognize the "close community of interests" inherent in the construction industry, where the wages and working conditions of one set of employees could often affect those of another. See id. at 661-63, 102 S.Ct. at 2080-81; Donald Schriver, 635 F.2d at 880. See also National Woodwork Manufacturers, 386 U.S. at 638-39, 87 S.Ct. at 1265; Essex County and Vicinity District Council of Carpenters and Millwrights v. NLRB, 332 F.2d 636, 640 (3d Cir.1964). The construction industry proviso was designed to recognize these realities and to allow certain otherwise prohibited secondary agreements to promote those interests. These secondary agreements might take the form of union-signatory clauses, in which an employer agreed not to subcontract work to any party that was not a signatory to the contract, see, e.g., Woelke, 456 U.S. at 647-48, 659 n. 12, 102 S.Ct. at 2073-74, 2079 n. 12, or union-standards clauses, in which an employer agreed not to subcontract work to any party unless that party agreed to comply with the terms of the union contract, see id. at 659 n. 12, 102 S.Ct. at 2080 n. 12; see also Donald Schriver, 635 F.2d at 880. As Senator Kennedy, the chairman of the Senate conferees who produced the final version of Landrum-Griffin in 1959, said:
 
 
 23
 Agreements by which a contractor in the construction industry promises not to subcontract work on a construction site to a nonunion contractor appear to be legal today. They will not be unlawful under [the proviso to] section 8(e). The proviso is also applicable to all other agreements involving undertakings not to do work on a construction project site with other contractors or subcontractors regardless of the precise relation between them.
 
 
 24
 105 Cong. Rec. at 17,900, reprinted in 2 Leg. Hist. at 1433.
 
 
 25
 The clause at issue in the instant case therefore clearly is protected by the construction industry proviso insofar as it bars the signatory employers from subcontracting work to other employers that are "not a party to or bound by th[e] Agreement." The more difficult question, however, is whether the clause has a uniquely and impermissibly broad scope by also precluding signatory employers from accepting subcontracting work from other contractors that are not bound by the agreement negotiated by AGC. The employers in the instant case argue that this aspect of the clause is a novel extension of such subcontracting clauses that first appeared in the industry around 1979. If they are correct, of course, then this aspect of the clause would not be protected by the construction industry proviso because it could not have been part of the "status quo in the construction industry [in 1959]." Woelke, 456 U.S. at 657, 102 S.Ct. at 2078. However, we believe, as did Judge Elfvin, that there is sufficient evidence indicating that practices such as the one at issue here were indeed part of the status quo in the construction industry at the time of the enactment of Landum-Griffin and that Congress therefore intended to protect such clauses.
 
 
 26
 First, as we have noted, Senator Kennedy, in commenting on the compromise version of Landrum-Griffin produced by a conference committee, noted that the proviso would reach "all ... agreements involving undertakings not to do work on a construction project site with other contractors or subcontractors regardless of the precise relation between them." 105 Cong.Rec. at 17,900, reprinted in 2 Leg.Hist. at 1433 (emphasis added). This seems to indicate that hot cargo provisions would be tolerated in the construction industry whether the signatory employer was subcontracting work to or receiving it from a nonsignatory. Moreover, as the Supreme Court in Woelke noted, the comments of the chairman of the Senate conferees are "entitled to substantial weight." Woelke, 456 U.S. at 656 n. 9, 102 S.Ct. at 2078 n. 9.
 
 
 27
 Second, the so-called "Lunden report," a study of pre-Landrum-Griffin subcontracting practices relied on by the Supreme Court in Woelke, indicates that clauses nearly identical to the one at issue here were indeed part of the status quo in the construction industry in 1959. The Lunden report examined more than 1,687 major collective bargaining agreements, including 155 in the construction industry. See Lunden, Part I, supra, at 579-82. More than fifty of the construction industry contracts studied contained restrictive subcontracting clauses. See Lunden, Subcontracting Clauses in Major Contracts (Part II), 84 Monthly Lab.Rev. 715, 715 (1961). The report quoted from one typical example of such a clause, which provided:
 
 
 28
 Any employer or shop signed to this agreement shall not sublet to or from any ... company ... unless the work to be performed is performed under the terms of this contract, and the employer whose employees perform such work is either signatory to this contract or has signed a short form contract which requires acceptance of and being bound by all the terms and conditions of this contract.
 
 
 29
 Id. (emphasis added). Thus, clauses prohibiting subcontracting both to and from non-signatories appear to have existed before the passage of Landrum-Griffin. This conclusion is further borne out by the testimony of Senator Curtis regarding an early Senate version of the Landrum-Griffin legislation. Senator Curtis noted that hot cargo clauses were then used "extensively" by major trade unions and that under such clauses prevalent in the construction industry in Baltimore, "unionized general contractors could not hire nonunion subcontractors, and unionized subcontractors could not work for nonunion general contractors." Labor-Management Reform Legislation: Hearings Before the Subcommittee on Labor, 86th Cong., 1st Sess. 752 (1959). The employers in the instant case argue that Senator Curtis' comments are unpersuasive because he made them in support of more restrictive legislation that ultimately was rejected. The employers, however, misunderstand the import of Senator Curtis' comments. They are persuasive not because of Senator Curtis' role in the passage of Landrum-Griffin, but because they provide one more piece of evidence that subcontracting clauses such as the one at issue here were indeed part of the status quo in the construction industry in 1959.
 
 
 30
 Finally, as the Supreme Court noted in Woelke, courts and the NLRB had upheld broad subcontracting clauses in construction industry labor contracts in the years prior to 1959. See Woelke, 456 U.S. at 658-59 & n. 11, 102 S.Ct. at 2079 & n. 11 (citing Associated General Contractors of America, Inc. (St. Maurice, Helmkamp & Musser), 119 N.L.R.B. 1026 (1957), enf'd, 266 F.2d 905 (D.C.Cir.), cert. denied, 361 U.S. 834, 80 S.Ct. 86, 4 L.Ed.2d 76 (1959)). See also id. at 659 n. 12, 102 S.Ct. at 2080 n. 12 (noting other evidence indicating prevalence of broad subcontracting clauses in pre-1959 construction industry). This evidence and other factors led a unanimous Supreme Court in Woelke to take a permissive stance regarding such clauses, holding that the "construction industry proviso ... ordinarily shelters union signatory subcontracting clauses that are sought or negotiated in the context of a collective-bargaining relationship, even when not limited in application to particular jobsites at which both union and nonunion workers are employed." Id. at 666, 102 S.Ct. 2083. Many of the same factors, as well as the evidence of pre-1959 labor contracts similar to that at issue here, dictate that we take a similar stance. We believe that the clause at issue in this case falls within the intended scope of the construction industry proviso.
 
 
 31
 The employers in this case nonetheless argue that this clause is inconsistent with the overall policies underlying the National Labor Relations Act. They argue that the clause must satisfy what amounts to a two-part test: that it be part of the status quo in the construction industry as of 1959 and that it be generally consistent with policies underlying the NLRA. We disagree. If this practice was part of the status quo in the industry in 1959, then Congress in drafting section 8(e) meant to protect the practice and it follows a fortiori that it is consistent with the NLRA amendments contained in Landrum-Griffin. See Sun-Land Nurseries, 793 F.2d at 1114 n. 5 (relying on Woelke 's test of the status quo in 1959 and rejecting any further inquiry into the "purpose" of a clause).
 
 
 32
 In a similar vein, the employers argue that the clause at issue here will force contractors in the affected region of New York State to recognize particular unions or particular union standards in order to secure work. That may be so. Nevertheless, we must assume that Congress in 1959 anticipated such consequences and nonetheless decided to enact the construction industry proviso. We should not second-guess the Congress on such policy matters. Secondary subcontracting agreements such as the one at issue here inevitably create a so-called " 'top-down' pressure for unionization; they ... take the representation decision out of the hands of the employees and place it in the hands of the employers." Woelke, 456 U.S. at 662-63, 102 S.Ct. at 2081. Although Congress sought in 1959 to limit such "top-down" organization with the passage of section 8(e), see id. at 662-64, 102 S.Ct. at 2081-82; Connell Construction, 421 U.S. at 632-33, 95 S.Ct. at 1839-40, it nonetheless "concluded that the community of interests on the construction jobsite justified the top-down organizational consequences that might attend the [practices authorized by the construction industry proviso]." Woelke, 456 U.S. at 663, 102 S.Ct. at 2082. See also A.L. Adams Construction Co. v. Georgia Power Co., 733 F.2d 853, 856 (11th Cir.1984) (holding that pressure on subcontractors to unionize caused by a restrictive subcontracting clause is acceptable if clause is part of a valid collective bargaining agreement), cert. denied, 471 U.S. 1075, 105 S.Ct. 2155, 85 L.Ed.2d 511 (1985). Congress made a similar concession for the construction industry when it enacted section 8(f) of the NLRA, 29 U.S.C. Sec. 158(f) (1982), allowing so-called prehire agreements, under which employers and unions may enter into collective bargaining agreements in certain circumstances even when the employees in the bargaining unit have not yet designated the union as their representative. See Woelke, 456 U.S. at 663-64, 102 S.Ct. at 2081-82.
 
 
 33
 The employers here argue that this clause creates a unique brand of "bottom-up" pressure, by which they presumably mean that nonunion general contractors such as Bhandari might be forced to recognize a particular union or to comply with certain standards in order to solicit work from unionized subcontractors such as Wellington. The potential antidemocratic effect of such a clause on workers, however, is no different than that created by the more typical clause discussed in Woelke; it still tends to create a pressure that will emanate from management downward within the structure of any given employer. The secondary organizational pressure created by the clause at issue here is not materially different from that created by a clause that restricts only the subcontracting of work to non-signatories. In fact, the Supreme Court in Woelke "recognize[d] that 'the use of union signatory subcontracting clauses [may] give a particular union a monopoly position in a labor market,' yet upheld such clauses nevertheless." Sun-Land Nurseries, 793 F.2d at 1114 (quoting Woelke, 456 U.S. at 663 n. 15, 102 S.Ct. at 2082 n. 15) (citation omitted).C. Antitrust Laws: Exemptions
 
 
 34
 Although the clause at issue here is protected by the construction industry proviso to section 8(e) of the NLRA, it is not necessarily beyond the reach of the federal antitrust laws. See id. at 1115. See also Pennington, 381 U.S. at 664-66, 85 S.Ct. at 1590-91. The practice also must fall within one of two recognized labor law exemptions from antitrust scrutiny--the statutory and nonstatutory exemptions. See, e.g., Connell Construction, 421 U.S. at 621-22, 95 S.Ct. at 1834-35; Sun-Land Nurseries, 793 F.2d at 1115; Home Box Office, Inc. v. Directors Guild of America, Inc., 531 F.Supp. 578, 585 (S.D.N.Y.1982), aff'd, 708 F.2d 95 (2d Cir.1983) (per curiam). The statutory exemptions, which are contained in certain provisions of the Clayton Act, see 15 U.S.C. Sec. 17 (1982); 29 U.S.C. Sec. 52 (1982), and the Norris-LaGuardia Act, see 29 U.S.C. Secs. 104, 105, 113 (1982), exempt certain union activities from antitrust scrutiny. Connell Construction, 421 U.S. at 621-22, 95 S.Ct. at 1834-35. They do not, however, reach concerted activity between a union and a nonlabor party, such as an employer. Id.; Sun-Land Nurseries, 793 F.2d at 1115. Therefore, if the clause at issue is to survive, it must find protection in the nonstatutory exemption, which does permit certain union-employer agreements. See Connell Construction, 421 U.S. at 622, 95 S.Ct. at 1835 (citing Local Union No. 189, Amalgamated Meat Cutters & Butcher Workmen of North America v. Jewel Tea Co., 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965)).
 
 
 35
 The purpose of the nonstatutory exemption is "to reconcile [the] conflicting national policies [inherent in the labor and antitrust laws]--one protecting business competition, the other encouraging collective bargaining." Home Box Office, 531 F.Supp. at 591. In what we have called the "classic formulation" of the nonstatutory exemption, see Berman Enterprises Inc. v. Local 333, United Marine Division, Int'l Longshoremen's Ass'n, 644 F.2d 930, 935 n. 8 (2d Cir.), cert. denied, 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 381 (1981), a plurality of the Supreme Court in Jewel Tea held that agreements between a union and an employer are exempt from antitrust scrutiny if they are
 
 
 36
 so intimately related to wages, hours and working conditions that the union['s] successful attempt to obtain th[e] provision[s] through bona fide, arm's length bargaining in pursuit of their own labor union policies, and not at the behest of or in combination with nonlabor groups, falls within the protection of the national labor policy and therefore is exempt from the Sherman Act.
 
 
 37
 Jewel Tea, 381 U.S. at 689-90, 85 S.Ct. at 1601-02. See also Berman Enterprises, 644 F.2d at 935 n. 8; Home Box Office, 531 F.Supp. at 590.
 
 
 38
 In assessing whether any particular agreement is protected by the nonstatutory exemption, the " 'crucial determinant is not the form of the agreement ... but its relative impact on the product market and the interests of union members.' " Id. (quoting Jewel Tea, 381 U.S. at 690 n. 5, 85 S.Ct. at 1602 n. 5). In essence, the test is one that balances the conflicting policies embodied in the labor and antitrust laws, with the policies inherent in labor law serving as the first point of reference. See Jewel Tea, 381 U.S. at 689-90, 85 S.Ct. at 1601-02; Home Box Office, 531 F.Supp. at 591-93. See also 6 Von Kalinowski, Antitrust Law and Trade Regulation, Sec. 48.03, at 48-30--48-32 (1987). First, the agreement at issue must further goals that are protected by national labor law and that are within the scope of traditionally mandatory subjects of collective bargaining. See Jewel Tea, 381 U.S. at 689-90, 85 S.Ct. at 1601-02; Sun-Land Nurseries, 793 F.2d at 1115-17; Consolidated Express, Inc. v. New York Shipping Ass'n, Inc., 602 F.2d 494, 517-18 (3d Cir.1979), vacated and remanded on other grounds, 448 U.S. 902, 100 S.Ct. 3040, 65 L.Ed.2d 1131 (1980); Mackey v. National Football League, 543 F.2d 606, 614-15 (8th Cir.1976), cert. dismissed, 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977); Home Box Office, 531 F.Supp. at 591-93; 6 Von Kalinowski, supra, at 48-32. Second, the agreement must not impose a "direct restraint on the business market [that] has substantial anticompetitive effects, both actual and potential, that would not follow naturally from the elimination of competition over wages and working conditions [that results from collective bargaining agreements]." Connell Construction, 421 U.S. at 625, 95 S.Ct. at 1836. See also Mid-America Regional Bargaining Ass'n v. Will County Carpenters District Council, 675 F.2d 881, 892 (7th Cir.), cert. denied, 459 U.S. 860, 103 S.Ct. 132, 74 L.Ed.2d 114 (1982); Consolidated Express, 602 F.2d at 517; Home Box Office, 531 F.Supp. at 591; 6 Von Kalinowski, supra, at 48-32.[2]
 
 
 39
 Given these standards, and the background of the construction industry proviso discussed earlier, we agree with the position taken by the Ninth Circuit, sitting in banc, in Sun-Land Nurseries. There, the court rejected an antitrust challenge to a restrictive subcontracting clause, holding that clauses protected by the construction industry proviso "must be given breathing room to operate in their intended fashion without interference from the antitrust laws." Sun-Land Nurseries, 793 F.2d at 1117. Although the court "refuse[d] to rule that such clauses are wholly exempt from scrutiny if they are shown to be instruments of an antitrust conspiracy otherwise existing, [it did] hold that a valid subcontracting clause contained in a collective bargaining agreement cannot serve as the basis of an antitrust claim." Id. (emphasis added). See also Suburban Tile Center, Inc. v. Rockford Building and Construction Trades Council, 354 F.2d 1, 3 (7th Cir.1965) ("success in securing" restrictive subcontracting clause is not alone enough to constitute an antitrust violation), cert. denied, 384 U.S. 960, 86 S.Ct. 1585, 16 L.Ed.2d 673 (1966). Cf. A.L. Adams Construction, 733 F.2d at 855-58 & n. 5 (holding, without considering nonstatutory antitrust exemption, that a clause in a valid collective bargaining agreement that is permitted by the construction industry proviso is permissible under antitrust law in the absence of any other evidence of an unlawful restraint on trade). This comports with the Supreme Court's suggestion in Jewel Tea that restrictive subcontracting clauses obtained as a result of "bona fide, arm's-length bargaining in pursuit of ... [legitimate] labor policies" are entitled to the protection of the nonstatutory exemption, whereas agreements secured "at the behest of or in [unlawful] combination with nonlabor groups" are not. See Jewel Tea, 381 U.S. at 689-90, 85 S.Ct. at 1601-02. It is also consistent with Connell Construction, which involved a restrictive subcontracting agreement between a union and an employer with whom the union had not engaged in collective bargaining. See 421 U.S. at 619, 95 S.Ct. at 1833. The Court held the clause illegal, but suggested that such an agreement might have enjoyed an antitrust exemption "if it [had been] included in a lawful collective-bargaining agreement." Id. at 625-26, 95 S.Ct. at 1836-37 (citing Pennington, 381 U.S. at 664-65, 85 S.Ct. at 1590; Jewel Tea, 381 U.S. at 689-90, 85 S.Ct. at 1601-02).
 
 
 40
 The subcontracting clause in the instant case was included in a valid collective bargaining agreement and we have no reason to believe that it was the product of anything other than "bona fide, arm's-length bargaining," Jewel Tea, 381 U.S. at 690, 85 S.Ct. at 1602. Moreover, in seeking the inclusion of the clause in the agreement, the union was pursuing a legitimate bargaining objective, see Suburban Tile Center, 354 F.2d at 3, and was undoubtedly seeking to promote the "close community of interest[s]" among construction workers within its jurisdiction. See Woelke, 456 U.S. at 661-63, 102 S.Ct. at 2080-81. See also National Woodwork Manufacturers, 386 U.S. at 638-39, 87 S.Ct. at 1265. Although the agreement will undoubtedly have some anticompetitive impact in the affected area of New York State--particularly among employers that do not recognize the union or that are not willing to be bound by the terms of the AGC agreement--we believe that certain anticompetitive pressures, like organizational pressures, are "implicit in the construction industry proviso," Woelke, 456 U.S. at 663, 102 S.Ct. at 2081; see also Jim McNeff, Inc. v. Todd, 461 U.S. 260, 270 n. 9, 103 S.Ct. 1753, 1759 n. 9, 75 L.Ed.2d 830 (1983). Even a threat that the union involved might achieve monopoly status in the relevant labor market would not, standing alone, necessarily mandate antitrust liability. Cf. Woelke, 456 U.S. at 663 n. 15, 102 S.Ct. at 2082 n. 15; Sun-Land Nurseries, 793 F.2d at 1114. As long as this clause was embodied in a legitimate collective bargaining agreement, we believe that our primary touchstone in assessing its validity must be the policies embodied in federal labor law. Cf. Home Box Office, 531 F.Supp. at 591-93. Therefore, because we detect no evidence here of "an antitrust conspiracy otherwise existing," see Sun-Land Nurseries, 793 F.2d at 1117, we believe that the protection of the construction industry proviso to section 8(e) of the NLRA precludes any further antitrust scrutiny. The clause at issue is protected by a nonstatutory antitrust exemption.
 
 CONCLUSION
 
 41
 For all of the foregoing reasons, the judgment of the district court is affirmed and the parties are ordered to proceed to arbitration under the terms of the collective bargaining agreement to determine if there has been a violation of the agreement.
 
 
 
 [1]
 The garment industry proviso creates an even broader exception than the construction industry proviso, allowing unions in the garment industry to use restrictive subcontracting clauses as organizational and economic weapons. See Danielson v. Joint Board of Coat, Suit and Allied Garment Workers' Union, 494 F.2d 1230, 1236 (2d Cir.1974) (Friendly, J.). See also Connell Construction Co. v. Plumbers & Steamfitters Local Union No. 100, 421 U.S. 616, 633 n. 13, 95 S.Ct. 1830, 1840 n. 13, 44 L.Ed.2d 418 (1975)
 
 
 [2]
 In Mackey, the Eighth Circuit articulated a three-part test to determine whether a particular agreement enjoys the protection of the nonstatutory exemption. First, the restraint on trade must primarily affect only the parties to the agreement. Second, the agreement must concern a mandatory subject of collective bargaining. Third, the agreement must be the product of bona fide, arm's-length bargaining. See Mackey, 543 F.2d at 614. The Ninth Circuit recently employed this three-part analysis. See Continental Maritime of San Francisco, Inc. v. Pacific Coast Metal Trades District Council, 817 F.2d 1391, 1393 (9th Cir.1987). Although we believe that the agreement in the instant case could satisfy such a test, we need not adopt this particular analysis. Rather, we rely on the discussion of Jewel Tea and Connell Construction by Judge Sofaer in Home Box Office, 531 F.Supp. at 591-93, which we subsequently endorsed. See 708 F.2d at 95