# In the

# United States Court of Appeals

## For the Seventh Circuit

---

No. 06-4367

UNITED RENTALS HIGHWAY TECHNOLOGIES, INC.,

*Plaintiff-Appellant*,

*v.*

INDIANA CONSTRUCTORS, INC., *et al.*,

*Defendants-Appellees*.

---

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:05-CV-00571-SEB-VSS—**Sarah Evans Barker**, *Judge*.

---

ARGUED SEPTEMBER 7, 2007—DECIDED MARCH 5, 2008

---

Before BAUER, POSNER, and SYKES, *Circuit Judges*.

POSNER, *Circuit Judge*. Adam Smith believed that the key to economic progress is specialization. The production process is subdivided into narrow tasks, and workers gain speed and accuracy from performing just one of them. As markets expand, the opportunities for specialization expand too, because having a substantial market for its output the specialized producer (and its specialized subdivisions) can grow large enough to reap economies of scale and thus minimize its costs. We can see the pro-

cess at work in the highway construction industry. The creation of the interstate highway system in the 1950s and 1960s, followed later by an enormous expansion in its use that caused tremendous wear and tear and hence a constant need for repair and rebuilding, enabled unprecedented specialization in the highway construction industry. Anyone who travels on the interstate system in northern states understands the force of the dictum that on the interstate highways in those states there are only two seasons: winter and construction.

United Rentals is one of the specialized producers enabled by the expansion of the highway construction industry. It is a member of the "traffic control" submarket. The firms in that market help to protect highway construction workers from being hit by the vehicles using the stretch of the highway that the workers are building, repairing, or rebuilding. The firms try to do this in a way that will minimize traffic delay, and traffic accidents not limited to hitting workers. When construction activity is about to begin, employees of the traffic control firm place cones, barrels, concrete blocks, or other barricades in position to block or alter traffic lanes. The workers also paint stripes on the road to indicate the new lanes; install warning signs to guide drivers using the highway; and place guard rails to keep vehicles from veering off into what may, as a result of the construction activity, be a nonexistent shoulder. The barricades, signs, guard rails, and other safety devices are owned and stored by the traffic control firm and brought to the construction site as needed. The firm installs its devices before the construction begins and removes them when it is finished. If flagmen are required, they may be supplied either by the traffic control firm or by the general contractor.

The traffic control firm is a subcontractor of the general contractor. Before the emergence of traffic control as a separate business, traffic control was done by the general contractor or by a construction subcontractor not specialized to traffic control.

Road work in Indiana is done almost entirely by contractors who belong to a trade association called Indiana Constructors, which has for many years negotiated collective bargaining agreements for its members with the Laborers International Union (actually with its locals, but we can ignore that detail). In 2004, the collective bargaining agreement then in force was modified to forbid the association's members to subcontract work at a construction site to a firm that had not signed a collective bargaining agreement with the Laborers Union. The union had pushed for the modification because it wanted as much work at construction sites as possible to be done by its members. This was a blow to United Rentals because it had a collective bargaining agreement with another union (also it didn't want to bargain with the Laborers Union when that agreement expired); and so it filed a charge with the National Labor Relations Board that Indiana Constructors and the Laborers Union were violating the National Labor Relations Act's "hot cargo" provision. NLRA § 8(e), 29 U.S.C. § 158(e). The provision forbids a union and employer to agree that the employer will refuse to deal with another employer (in this case a subcontractor), as Indiana Constructors has agreed with the Laborers Union to do with respect to United Rentals and any other subcontractor that does not have a collective bargaining agreement with that union.

But there is an exception to the hot cargo provision for "an agreement between a labor organization and an

employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work," *id*., including highways. *Spectacor Management Group v. NLRB*, 320 F.3d 385, 395 (3d Cir. 2003); *International Union of Operating Engineers, Local Union No. 12, AFL-CIO*, 131 N.L.R.B. 520, 526-27 (1961). On the basis of the exception, the Board's General Counsel declined to file a complaint against Indiana Constructors or the Laborers Union.

The company then filed this suit, which charges the contractors' association and the union with conspiring to exclude United Rentals from the traffic control market in Indiana, in violation of section 1 of the Sherman Act, 15 U.S.C. § 1. There are other charges as well, but the only one of the others that is pursued in this appeal is a charge (against the union alone) of violation of section 303 of the Taft-Hartley Act, 29 U.S.C. § 187(a). That section, by incorporating by reference 29 U.S.C. § 158(b)(4)(ii)(A), forbids a union to "forc[e] or requir[e]" an employer to "enter into any agreement which is prohibited by" the hot cargo provision. Unlike the incorporated provision of the National Labor Relations Act, which is enforceable only by the Labor Board, section 303 is enforceable by suit in federal court.

The district court granted summary judgment in favor of the defendants on all counts, and United Rentals appeals. So we have an antitrust claim and a hot cargo claim to consider. We'll start with the latter because the former is partly derivative from it.

Before Congress enacted the hot cargo provision, along with its exception for the construction industry, in 1959, hot cargo clauses had been pervasive in the industry, had

been upheld repeatedly as lawful, and had not caused the problems associated with closed shops—though one reason, inapplicable to this case, was that most construction workers are hired from hiring halls; the halls are operated by unions but the unions are required to refer all comers, and not just workers represented by a union, to contractors and subcontractors. *Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 664-65 (1982); *Lucas v. NLRB*, 333 F.3d 927, 932 (9th Cir. 2003).

So one reason for the construction-industry exception was just a desire to ratify an acceptable status quo. *Milwaukee & Southeast Wisconsin District Council of Carpenters v. Rowley-Schlimgen, Inc.*, 2 F.3d 765, 767 (7th Cir. 1993). But another was to prevent friction at construction job sites. *Id.*; *Local 210, Laborers' International Union of North America v. Labor Relations Division Associated General Contractors of America, N.Y.S. Chapter, Inc.,* 844 F.2d 69, 76 (2d Cir. 1988). More than just work stoppages were at stake. Much construction work is dangerous, including road construction in the presence of highway traffic; and there was concern that the frictions engendered by union workers' working side by side at a construction job site with nonunion workers or workers belonging to another union would reduce safety as well as efficiency. *Woelke & Romero Framing, Inc. v. NLRB*, *supra*, 456 U.S. at 662.

Before there was a separate market in traffic control, there was no impediment to the general contractor's requiring whatever subcontractor performed traffic control for the contractor to bargain collectively with the general contractor's union. For a time after traffic control broke off and became a separate business, general contractors and construction workers' unions did not insist that the employees of traffic control subcontractors

be represented by the general contractor's union, though even in that transitional period the collective bargaining agreement between the Indiana Constructors and the Laborers Union said that the union "encourages its members to utilize sub-contractors who are signatory to collective bargaining agreements with the Laborers Union. Such sub-contractors help to promote peace and harmony of the job-site and to avoid labor dispute interruption of work." The modification in the collective bargaining agreement of which United Rentals complains restores fully the practice that prevailed before traffic control became a separate market.

United Rentals' employees work at construction sites. But the company argues that since they arrive at and depart from the site before the construction workers appear, and, later, arrive and leave (to pick up their barricades and signs) after those workers have completed their work and left the site, there is no danger of job-site friction. That is wrong as a matter of fact, as is the suggestion that the existence of such friction is a criterion for application of the construction exception to the statutory hot cargo provision rather than a reason for the exception.

The general contractor wants to minimize both the interval between the departure of the traffic control workers after they have set up the barricades and erected the signs and the start of the actual construction, and the interval between the departure of those workers after the construction is complete and the arrival of the traffic control workers to remove the barricades and signs. The effort to minimize delays, to the extent successful, makes it inevitable that sometimes both sets of workers will be present at the job site at the same time—often there will be traffic control workers at one end of the construc-

tion project and construction workers at the other. The traffic control workers are responsible for the safety of the other workers at the site. Should tensions between the two groups of worker lead the traffic control workers to relax their concern for the safety of the construction workers, the probability of an accident would increase.

United Rentals points out that its employees are not engaged in construction, but rather in a preparatory or ancillary activity. But the statutory exception is not for construction workers as such; it is for workers at a construction site; and traffic control workers work at highway construction sites. The distinction drawn by the exception is between workers at a construction site and workers who supply or deliver the building materials to the site but do not work there. *NLRB v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, Local No. 294*, 342 F.2d 18, 21-22 (2d Cir. 1965); *General Truck Drivers, Chauffeurs, Warehousemen & Helpers of America, Local No. 957 v. NLRB*, 934 F.2d 732, 737-38 (6th Cir. 1991); *International Union of Operating Engineers, Local 12,* 314 N.L.R.B. 874, 876-77 (1994); *Teamsters Local 291 (Lone Star Industries)*, 291 N.L.R.B. 581, 584 (1988); *Ohio Valley Carpenters District Council (Cardinal Industries, Inc.)*, 136 N.L.R.B. 977, 988-89 (1962). Placing traffic control workers within the exception maintains this distinction and creates a clear rule. March down the road of attempting to distinguish "real" construction workers from other workers at the construction site and you will quickly find yourself in a trackless wilderness. Is a subcontractor who supplies the flagmen within or without the exemption, since flagmen do not do construction work? What about a subcontractor who provides canteen workers to serve food to the workers at the site? Or who

landscapes the site when the construction is finished? Or who maintains the construction equipment at the site but does not operate it? Our approach enables us to avoid having to try to answer these questions.

But a complication is introduced by the fact that the hot cargo clause in the collective bargaining agreement between the Indiana Constructors and the Laborers Union is not identical to the construction-industry exception to the statutory prohibition against hot cargo clauses. The clause in the agreement forbids employers to "contract any work covered by this Agreement to be done at the site of construction, alterations, repairs, or any new construction *or any other work* to any person, firm or company that does not have an existing labor agreement or will not sign an agreement, with the Union covering such work within the scope of this Agreement" (emphasis added). The corresponding phrase in the statute is "work to be done *at the site*" (emphasis added). United Rentals argues that "any other work" includes work off-site, such as the preparation of signs and barricades at the company's workshop. It claims that three contractors refused to allow United Rentals to bid on equipment rentals, which are not an on-site activity.

The parties to the agreement, however, disclaim the broad interpretation (which is anyway hardly compelled by its language—"at the site" is there, just earlier than it is in the statute), and having disclaimed it they would be estopped to enforce it against a contractor that allowed United Rentals to bid on off-site work. Moreover, they had disclaimed it in a memorandum of understanding signed before the three contractors refused to let United Rentals bid on equipment rentals. Those contractors' refusal to do business with United

Rentals could not have been premised on the clause in the collective bargaining agreement.

So there is no merit to the section 303 claim, and we turn to the antitrust claim. It might seem that since the hot cargo clause in the collective bargaining agreement is lawful under the National Labor Relations Act, it cannot violate the Sherman Act. But that is not correct, or at least not quite correct (a qualification that will become clearer as discussion proceeds). Section 8(e) does not say that hot cargo provisions in collective bargaining agreements in the construction industry are the cat's meow. It just says they don't violate the National Labor Relations Act. Of course it would not make any sense to say that they violate federal *labor* policy, because that policy, so far as bears on hot cargo clauses, is stated in section 8(e). But they could violate something else, such as the Sherman Act—though not just by virtue of limiting competition in labor markets. The Clayton Act expressly exempts from federal antitrust law agreements among workers or their representatives not to compete with each other regarding wages or other terms and conditions of employment. 15 U.S.C. § 17; see also 29 U.S.C. § 52. And in conformity with the policy that informs the exemption, collective bargaining agreements (agreements of the workers' representative with an employer rather than agreements among workers, so not within the statutory exemption) are held not to violate the Sherman Act, to avert too sharp a clash between antitrust and labor policies, e.g., *Clarett v. National Football League*, 369 F.3d 124, 130-31 (2d Cir. 2004), even though such agreements affect the prices and output of goods and services, just as sellers' cartels do, by driving wages above competitive levels. "[I]t would be difficult, if not impossible, to re-

quire groups of employers and employees to bargain together, but at the same time to forbid them to make among themselves or with each other *any* of the competition-restricting agreements potentially necessary to make the process work or its results mutually acceptable . . . . [T]o give effect to federal labor laws and policies and to allow meaningful collective bargaining to take place, some restraints on competition imposed through the bargaining process must be shielded from antitrust sanctions." *Brown v. Pro Football, Inc.*, 518 U.S. 231, 237 (1996) (emphasis in original).

But unlike a collective bargaining agreement that just specifies wages and other terms and conditions of work, the enforcement of a hot cargo clause looks like an exclusionary practice: a firm gangs up with a union against another firm and perhaps drives it from the market, reducing competition between firms. Exclusionary practices can be challenged under the Sherman Act. Suppose the, or one, purpose of the hot cargo clause in this case is to squeeze United Rentals out of the traffic control market because it pays its workers less than its competitors are required to pay their workers by virtue of being bound by a collective bargaining agreement with the Laborers Union. Suppose, in other words, continuing the feline analogy, that the Indiana Constructors association is a cat's paw of traffic control subcontractors who, under the union's prodding, want to boycott a low-cost competitor. That could violate the Sherman Act. *Connell Construction Co. v. Plumbers & Steamfitters Local Union No. 100*, 421 U.S. 616, 624-26 (1975); *United Mine Workers of America v. Pennington*, 381 U.S. 657, 663 (1965); *Phoenix Electric Co. v. National Electrical Contractors Ass'n*, 81 F.3d 858, 860-61 (9th Cir. 1996).

It might seem to make no sense for contractors to agree with a union to squeeze a low-cost subcontractor out of the market. The subcontractors are suppliers of services to the contractors, and a rational businessman wants to minimize the cost of his inputs. And an antitrust claim "that simply makes no economic sense" cannot "by itself support a finding of antitrust liability." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). But there are cases in which a firm is induced to enforce a cartel. It has been argued, for example, that the Standard Oil Trust acted as an agent of a railroads' cartel, receiving, in exchange for helping the railroads charge monopolistic rates, railroad rebates that gave it a cost advantage over its competitors. Elizabeth Granitz & Benjamin Klein, "Monopolization by 'Raising Rivals Costs': The *Standard Oil* Case," 39 *J. Law & Econ.* 1 (1996). In *Eastern States Retail Lumber Dealers' Ass'n v. United States*, 234 U.S. 600 (1914), retail lumber dealers boycotted wholesalers who sold to the dealers' customers; by knuckling under to the dealers' demand not to make such sales, a wholesaler would be helping to maintain a cartel (that of the retail dealers) that by keeping lumber prices up reduced the wholesalers' sales. And then there is the *Connell* case. Connell was a general building contractor and Local 100 was the bargaining representative for mechanics. After the union struck and picketed, Connell caved in to its demand that mechanical work be subcontracted only to firms whose mechanics were represented by the union. Maybe the Laborers Union, like Local 100 in *Connell*, has enough economic muscle to force the contractors to boycott subcontractors whose workers are not represented by the union. If that were not a possibility, it would be difficult to understand why, before they were prohibited (outside the construction

industry), hot cargo clauses were common provisions of collective bargaining agreements.

So might this case actually be governed by *Connell*, where the Supreme Court said that immunizing Local 100's hot cargo provision from the Sherman Act "would give construction unions an almost unlimited organizational weapon," 421 U.S. at 631 (footnote omitted)? Then United Rentals would be home free. But there are critical differences between the cases. There was no collective bargaining agreement in *Connell*, as there is here, and no contention that contractor or union was trying to protect employees at the construction sites from working cheek by jowl with nonunion workers—the hot cargo clause was not limited to sites on which there *were* any union workers. In the words of the Court, "Local 100 does not suggest that its subcontracting agreement is related to any of these policies [the policies that animate the exception to the hot cargo clause for the construction industry]. It does not claim to be protecting Connell's employees from having to work alongside nonunion men. The agreement apparently was not designed to protect Local 100's members in that regard, since it was not limited to jobsites on which they were working. Moreover, the subcontracting restriction applied only to the work Local 100's members would perform themselves and allowed free subcontracting of all other work, thus leaving open a possibility that they would be employed alongside nonunion subcontractors. Nor was Local 100 trying to organize a nonunion subcontractor on the building project it picketed." *Id*. It was just trying, in cahoots with an employer, to eliminate nonunion subcontractors so that the workers it represented would have more work and, not having to compete with nonunion labor, higher wages.

Because there was no collective bargaining agreement in *Connell* (an omission deemed in *A.L. Adams Construction Co. v. Georgia Power Co.,* 733 F.2d 853, 856-57 (11th Cir. 1984), to be fatal to invoking section 8(e) in defense against an antitrust claim), no concern with reducing job-site friction between union and nonunion workers, and no effort by the union to represent more workers, there was no applicable labor-law policy, rooted in the construction-industry exception to the statutory prohibition of hot cargo clauses, to offset the anticompetitive consequences of the clause. In our case, in contrast, the hot cargo clause is in the heartland of the construction exception to the statutory prohibition. United Rentals presents no evidence that the consequences of the clause are any more dire from an antitrust standpoint than those of any other hot cargo clause in the construction industry. It does not advance the cat's paw theory, present evidence of an exclusionary motive, or (what is the same point, really) deny that the union is trying to increase its representation of workers; instead it argues that the union is trying to represent traffic control workers without their having to elect the union as their collective bargaining representative. Section 8(f) of the National Labor Relations Act complements section 8(e) by allowing employers "engaged primarily in the building and construction industry," such as the members of the Indiana Constructors association, to enter into collective bargaining agreements covering their subcontractors' employees with unions that have *not* been voted in as those employees' exclusive bargaining representatives. But that is not a goal to trouble the Sherman Act.

Given the absence of traditional antitrust concerns, a decision in United Rentals' favor would be tantamount

to holding that *all* hot cargo clauses in the construction industry violate the Sherman Act. A type of agreement affirmatively sanctioned by Congress cannot be deemed a per se violation of the Sherman Act. So we intimated, with specific reference to the construction exception, in *Suburban Tile Center, Inc. v. Rockford Building & Construction Trades Council*, 354 F.2d 1, 3 (7th Cir. 1965), and so the Second Circuit held in *Local 210, Laborers' International Union of North America v. Labor Relations Division, supra*, 844 F.2d at 79-81, and the Ninth Circuit in *Sun-Land Nurseries, Inc. v. Southern California District Council of Laborers*, 793 F.2d 1110, 1117 (9th Cir. 1986) (en banc); compare *A.L. Adams Construction Co. v. Georgia Power Co., supra*, 733 F.2d at 856-57. To rule otherwise would be to make the Sherman Act, enacted in 1890, repeal a statutory provision enacted in 1959, reversing the arrow of time.

AFFIRMED.